**THE WINTERTON, LLC,**
Appellant–Defendant,

v.

**WINTERTON INVESTORS, LLC,**
Appellee–Plaintiff,

and

Scott M. Brown, Appellant–
Intervening Plaintiff,

v.

The Winterton, LLC and Kevin
Kirkpatrick, Appellees–In-
tervening Defendants.

No. 49A04–0710–CV–608.

Court of Appeals of Indiana.

Jan. 22, 2009.

Transfer Denied April 30, 2009.

Rory O'Bryan, Timothy J. Hulett, Stephen J. Peters, David I. Rubin, Indianapolis, IN, Attorneys for Appellant.

Richard J. Dick, Marvin Mitchell, Indianapolis, IN, Attorneys for Appellee.

Michael Rabinowitch Maureen E. Ward, Indianapolis, IN, Attorneys for Appellant–Intervening Plaintiff.

## OPINION

SHARPNACK, Senior Judge.

### STATEMENT OF THE CASE

This appeal concerns two contracts for the sale of a multi-tenant office park by Winterton, LLC ("Winterton"). The first contract was between Winterton and Jacob Acquisitions, LLC, as purchaser, whose interest was later assigned to Winterton Investors, LLC ("Investors"). The second contract was between Winterton and Brown, as purchaser. The second contract was intended to be a back-up to the first

and was to become effective upon the termination or expiration of the first. As things developed, no sale occurred under either contract. Investors sued Winterton claiming a breach of the contract and seeking specific performance and damages. Brown intervened claiming that the first contract had terminated and seeking a declaration that his contract was effective.

The trial court granted a partial summary judgment to Investors against Winterton finding Winterton in breach of the contract and, following a trial on damages, entered a judgment against Winterton in the sum of $773,799.88. The trial court also granted summary judgment to Investors against Brown finding that the second contract did not become effective.

Winterton appeals the trial court's grant of partial summary judgment in favor of Investors, the trial court's denial of Winterton's cross-motion for summary judgment, and the trial court's award of damages in favor of Investors and against Winterton. In addition, Brown appeals the trial court's grant of summary judgment in favor of Investors, and the trial court's denial of his motion for summary judgment and its grant of summary judgment in favor of Winterton.

We reverse in part, affirm in part, and remand.

## ISSUES

Winterton contends that the trial court erred in granting summary judgment in favor of Investors. In support of this claim, Winterton presents several issues, two of which are dispositive. Winterton's restated issues are:

I. Whether the trial court erred by determining that Winterton breached its contract with Investors by failing to provide certificates of estoppel and subordination, non-disturbance and attornment agreements ("subordination agreements").

II. Whether the trial court erred by determining that Winterton materially breached its purchase agreement with Investors by changing the closing date.

In addition, Brown, as Intervening Plaintiff/Appellant, presents three issues for our review. The first issue offered by Brown is the same issue we resolve in section I, above. Of the two remaining issues set forth by Brown, one is dispositive. Restated, the issue is:

III. Whether the trial court erred by determining that the contract between Winterton and Investors did not terminate or expire such that the contract between Winterton and Brown never came into effect.

## FACTS AND PROCEDURAL HISTORY

In 2001, Jacob Acquisitions and Winterton entered into a purchase agreement ("Purchase Agreement") for the purchase of a multi-tenant office park. The Purchase Agreement contained no provision making Jacob Acquisitions' performance of the Purchase Agreement dependent upon it obtaining financing. However, Jacobs did seek financing, and its lender required certificates of estoppel and subordination agreements from the tenants of the office park. The estoppel certificates required the tenants to provide information regarding the status of their leases and business operations.

Following their execution of the Purchase Agreement, Winterton and Jacob Acquisitions executed three amendments to the Purchase Agreement. The third amendment to the Purchase Agreement extended the closing date to June 28, 2002, and made the closing subject to Jacob Acquisitions' receipt and review of the cer-

tificates of estoppel and subordination agreements. On June 27, 2002, the day before the closing date as set in the third amendment to the Purchase Agreement, counsel for Winterton informed Investors [1] that the closing had been re-scheduled for July 1, 2002. Investors refused to agree to the scheduling of the closing for July 1, 2002. Tadd Miller, a member of Investors, stated in a memorandum to counsel for Winterton that Investors could not commit until it received all estoppel certificates and subordination agreements. Miller further informed Winterton that Investors' lender was not willing to schedule a closing until it had been provided copies of all the estoppel certificates. As of June 28, 2002, 54 of the 65 tenants in the office park had executed estoppel certificates, and 53 of the 65 tenants had executed subordination agreements. The closing did not occur on June 28, 2002.

On July 1, 2002, counsel for Winterton again informed Investors that Winterton was prepared to close that afternoon and that it was of the opinion that obtaining estoppel certificates for Investors' lender was not its obligation. In a letter dated the same day, counsel for Investors responded by suggesting that the parties agree to a short extension of time in order to allow for the few remaining estoppel certificates and subordination agreements to be obtained. The closing again did not occur on July 1, 2002, and, on August 7, 2002, Investors filed suit against Winterton for breach of contract because Winterton had not provided the estoppel certificates.

Meanwhile, subsequent to the execution of the Purchase Agreement, Winterton executed with Scott Brown in December 2001 a back-up purchase agreement ("Back-up Purchase Agreement") for the purchase of the office park. The Back-up Purchase Agreement provided that, in the event that the Purchase Agreement expired or terminated, Brown would purchase the office park. In contrast to the Purchase Agreement, the Back-up Purchase Agreement contained a provision stating that Brown's obligations under the Back-up Purchase Agreement were subject to certain conditions, including the acquiring of financing by Brown, and required Winterton to provide certificates of estoppel from its tenants. The Back-up Purchase Agreement also contained a provision requiring Winterton to give Brown written notice within three (3) business days of an expiration or termination of the Purchase Agreement, which notice then triggered the commencement of a five (5) day period in which Brown was to deposit earnest money in the amount of twenty thousand ($20,000) into an account for that purpose. Winterton never gave Brown notice of an expiration or termination of the Purchase Agreement.

After Investors filed suit against Winterton, Brown intervened on September 24, 2002, seeking a declaratory judgment that the Purchase Agreement had terminated or expired and that the Back-up Purchase Agreement was the primary contract for the sale of the office park.

In 2004, Investors filed its motion for summary judgment against Winterton and Brown, and Winterton and Brown filed cross motions against Investors. On April 26, 2005, the trial court issued its Findings of Fact and Conclusions of Law granting partial summary judgment in favor of Investors and against Winterton finding that Winterton had breached the Purchase

---

1. We note that at some point after the execution of the third amendment to the Purchase Agreement, Jacob Acquisitions, LLC assigned its interest and rights in the Purchase Agreement to Investors.

Agreement by failing to provide the estoppel certificates and by changing the closing date. The court also granted Investors' motion for summary judgment against Brown by finding that the Purchase Agreement had not terminated and, therefore, the Back-up Purchase Agreement had never come into effect.

A bench trial was held to determine the damages due to Investors from Winterton by reason of the breach of the Purchase Agreement. The trial court awarded Investors damages in the amount of $773,799.88. This appeal ensued.

### DISCUSSION AND DECISION

The trial court granted summary judgment to Investors on its claim that Winterton had materially breached the Purchase Agreement. The trial court then awarded damages to Investors after trial on that issue. The trial court's judgment that Winterton breached the Purchase Agreement shall be reviewed by this Court as an appeal from a summary judgment based upon the materials submitted to the trial court in support of Investors' motion for summary judgment. The damages award shall be reviewed as a judgment following a trial, looking to the evidence and applicable measure of damages.[2]

On appeal from a grant or denial of summary judgment, our standard of review is identical to that of the trial court: whether there exists a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Winchell v. Guy*, 857 N.E.2d 1024, 1026 (Ind.Ct.App.2006); *see also* Ind. Trial Rule 56(C). Appellate review of a summary judgment motion is limited to those materials designated to the trial court. *Pond v. McNellis*, 845 N.E.2d 1043, 1053 (Ind.Ct.App.2006), *trans. denied*, 860 N.E.2d 590. All facts and reasonable inferences drawn therefrom are construed in favor of the nonmovant. *Id.* Further, the fact that the parties made cross-motions for summary judgment does not alter our standard of review. Rather, we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id.* Here, the trial court entered specific findings of fact and conclusions thereon. Although such findings and conclusions facilitate appellate review by offering insight into the trial court's reasons for granting summary judgment, they do not alter our standard of review and are not binding upon this Court. *Auburn Cordage, Inc. v. Revocable Trust Agreement of Treadwell*, 848 N.E.2d 738, 747 (Ind.Ct.App.2006).

### I. BREACH FOR FAILURE TO PROVIDE ESTOPPELS

Investors contends that Winterton was obligated by the Purchase Agreement to provide the certificates of estoppel and subordination agreements. Investors relies on certain provisions in the Purchase Agreement to support its claim. On the other hand, Winterton asserts that it was not obligated to provide the estoppel cer-

---

2. Investors argues that the entire appeal should be reviewed as a general judgment from the award of damages. However, it is clear that the trial court determined liability of Winterton to Investors for breach in the partial summary judgment and reserved only the determination of damages or specific performance for subsequent trial. The trial court's Entry on Pretrial Conference provided that Winterton's request to present evidence at trial as to whether its alleged breach was material was denied, and the parties stipulated that the issues for trial were damages, attorney fees and costs. Trial Court's Entry on Pretrial Conference ¶¶ 1 and 5, Appellant's App. at 305. Consequently, we review the issue of breach as it was decided, by summary judgment, and the issue of relief as it was decided, by trial.

tificates and subordination agreements and that, at most, providing the estoppels and subordination agreements was a condition precedent to closing which Investors could waive. Regardless of the label (i.e., contractual covenant or condition precedent to closing) the parties attach to the obligation to provide the estoppel certificates and subordination agreements, if Winterton was not contractually bound to provide them, its failure to provide them was not a breach of the Purchase Agreement. Therefore, we turn to the issue of Winterton's obligation(s) as set forth in the Purchase Agreement.

■■■ "The construction of a written contract is a pure question of law." *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC,* 870 N.E.2d 494, 501 (Ind.Ct.App.2007). The court's duty is to interpret a contract so as to ascertain the intent of the parties. *Bank of America, N.A. v. Ping,* 879 N.E.2d 665, 669 (Ind.Ct.App.2008). When interpreting a contract, we attempt to determine the intent of the parties at the time the contract was made by examining the language used in the instrument to express their rights and duties. *Whitaker v. Brunner,* 814 N.E.2d 288, 294 (Ind.Ct.App.2004), trans. denied. Where the language of the contract is unambiguous, the parties' intent is determined from the four corners of the document. *Four Seasons Mfg., Inc.,* 870 N.E.2d at 501. The unambiguous language of a contract is conclusive upon the parties to the contract as well as upon the court. *Bank of America, N.A.,* 879 N.E.2d at 670. We will neither construe unambiguous provisions nor add provisions not agreed upon by the parties. *Evan v. Poe & Associates, Inc.,* 873 N.E.2d 92, 98 (Ind.Ct.App.2007).

■■■ On the other hand, a contract is ambiguous when a reasonable person could find its terms susceptible to more than one interpretation. *Id.* If a contract is ambigu-ous, its meaning is to be determined by extrinsic evidence and its construction is a matter for the fact finder. *Four Seasons Mfg., Inc.,* 870 N.E.2d at 501. When trying to ascertain the intent of the parties, the court will read the contract as a whole. *Id.* Additionally, the court will make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Whitaker,* 814 N.E.2d at 294. The court must accept an interpretation of the contract that harmonizes its provisions rather than one that causes the provisions to conflict. *Four Seasons Mfg., Inc.,* 870 N.E.2d at 501.

■■■ We first note that the Purchase Agreement was not made contingent upon Investors obtaining financing for its purchase. Yet, Investors did seek financing, and it was Investors' lender that required the estoppels and subordination agreements. The terms of Investors' agreement with its lender are not included in the Purchase Agreement, and Winterton is not a party to that agreement. Therefore, Investors' obligations under its agreement with its lender in no way create an obligation for Winterton.

More importantly, the Purchase Agreement itself contains no requirement that Winterton provide the estoppel certificates and subordination agreements. In fact, the Purchase Agreement does not even mention estoppel certificates or subordination agreements. As the basis for its argument that Winterton was obligated to provide these documents, Investors relies upon Paragraphs 5(c) and 8(g) of the Purchase Agreement. These provisions provide as follows:

5. *Vendor's Covenants and Agreements.* From the date hereof through the Closing Date:

(c) *Additional Information:* Vendor shall furnish Purchaser all such additional information regarding the Property as Purchaser may from time to time reasonably request.

\* \* \* \*

8. *Vendor's Considerations.* At the Closing, Vendor shall execute and/or deliver to Purchaser the following instruments, documents and other considerations, in form and substance reasonably satisfactory to Purchaser's counsel:

(g) *Other Considerations:* Such other and further instruments, documents and other considerations as Title Insurer and as Purchaser may reasonably deem necessary or desirable, or as may be required, or which is usual to consummate the Transaction. At the Closing, Purchaser shall deliver to Vendor the balance of the Purchase Price. Vendor shall deliver possession of the Property to Purchaser on the Closing Date in the same condition as on the date hereof.

Purchase Agreement, Appellant's Appendix at 76, 78 and 79. Investors argues that the estoppel certificates and the subordination agreements come under the umbrella of the general language of these provisions. However, these provisions do not refer at all to estoppel certificates or subordination agreements. Moreover, 5(c) calls for Winterton to provide information regarding the property rather than requiring any production of documents, specifically estoppels and subordination agreements.

The language of these provisions upon which Investors relies is not effective to require that Winterton obtain from each of its tenants an executed estoppel whereby the tenant declares, among other things,

that it does not know of any assignment of the lease, that it is not in default on the lease, that it has no bankruptcy actions pending, and that it waives all defenses, offsets, credits and counterclaims to its obligations under the lease. Investors' interpretation would impose on Winterton an obligation to require each of its tenants to execute a document the tenants had no obligation to sign. Furthermore, compliance was beyond the control of Winterton to accomplish. The language in the Purchase Agreement cannot reasonably be read to impose such a requirement.

The only document that even mentions estoppel certificates and subordination agreements is the Third Amendment to the Purchase Agreement.[3] The Third Amendment provides:

NOW THEREFORE, in consideration of their mutual promises the parties agree as follows:

1. \* \* \* \*

2. The final closing date is hereby extended to June 28, 2002, *subject to the receipt and review of estoppels and subordination agreements.*

3. \* \* \* \*

Third Amendment to Purchase Agreement, Appellant's App. at 94 (emphasis supplied). The language of the Third Amendment provides that the closing was subject to the receipt and review of the estoppels and subordination agreements, but it does not say whose obligation it was to obtain them. Consequently, the terms contained in the amendment do not provide any guidance with regard to Investors' claim that Winterton was contractually obligated to obtain executed estoppel

---

**3.** The second amendment, which provided for a closing date "on or before June 15, 2002," did not make the closing subject to receipt and review of estoppel certificates and subordination agreements nor did it refer to such. Second Amendment to Purchase Agreement ¶ 4, Appellant's App. at 92.

certificates and subordination agreements from its tenants.

Investors further argues that because the Back-up Purchase Agreement contained a provision requiring estoppel certificates, it is a reasonable requirement to impose on Winterton in the context of the Purchase Agreement. However, the issue is not whether the requirement is a reasonable one, but rather whether the language in the Purchase Agreement can reasonably be read to impose such a requirement. We conclude that it cannot be so read. Moreover, the express provision for estoppel certificates in the Backup Purchase Agreement would more support the conclusion that no such requirement was intended in the Purchase Agreement rather than the opposite. Therefore, based upon the designated evidence, we conclude that the trial court erroneously determined that Winterton breached the Purchase Agreement by not providing to Investors estoppel certificates and subordination agreements for its tenants.[4]

## II.  BREACH BY CHANGE IN CLOSING DATE

The trial court also determined that Winterton breached the Purchase Agreement by "unilaterally chang[ing] the closing date," which breach was "a material breach of the [ ] Purchase Agreement." Trial Court's Findings of Fact and Conclusions of Law ##7 and 34, Appellant's App. at 25 and 31. The trial court further found that "[t]here was no waiver by Investors of the closing date of June 28,

2002." Trial Court's Findings of Fact and Conclusions of Law # 6, Appellant's App. at 25. On appeal, Winterton asserts that it did not breach the Purchase Agreement by changing the closing date and, even if changing the closing date constituted a breach, it was not a material breach.

We turn first to the parties' designated evidence. Although the Purchase Agreement provides that time is of the essence, *see* Purchase Agreement ¶ 7, Appellant's App. at 78, the parties mutually agreed to extend the closing date several times. The First Amendment to the Purchase Agreement extended the closing date to June 15, 2002. *See* First Amendment, Appellant's App. at 92. In addition, the Third Amendment extended the closing date to June 28, 2002, but stated that the date was "subject to the receipt and review of estoppels and subordination agreements." Appellant's App. at 94.

On June 27, 2002, the day before the scheduled closing, Winterton's counsel sent a letter to Tadd Miller of Investors stating that "Winterton, LLC, has set the time for closing ... for Monday, July 1, 2002." Appellant's App. at 100. In his affidavit, Miller states that Investors did not agree to change the closing date from June 28, 2002 to July 1, 2002. *See* Affidavit of Tadd Miller ¶ 5, Appellant's App. at 97. Yet, in a memorandum in response to Winterton's counsel on June 27, 2002, Miller states that Investors could not commit to closing on July 1, 2002, until it had

---

4. Investors also argues that Winterton was required to make a "reasonable effort" to acquire the estoppel certificates and subordination agreements even if the production of these documents was merely a condition precedent to closing. In support of its argument, Investors cites *Hamlin v. Steward,* 622 N.E.2d 535 (Ind.Ct.App.1993). However, the rule is that a party to a contract may not rely on the failure of a condition precedent to excuse that

party's performance unless that party has made a reasonable effort to make the condition precedent happen. *See Hamlin,* 622 N.E.2d at 540; *see also Kokomo Veterans, Inc. v. Schick,* 439 N.E.2d 639, 645 (Ind.Ct.App. 1982). Winterton is not relying on the nonproduction of the estoppels to excuse its nonperformance. Consequently, whether or not Winterton made a reasonable effort is not material.

received estoppels and subordination agreements for all the tenants of the office park. Moreover, in Miller's memorandum he stated that the estoppels were required for closing and that "[o]ur lender is not willing to schedule a closing until they have been provided copies of all of the estoppels." Appellant's App. at 178. In his affidavit, Miller affirms that the estoppels and subordination agreements were required by Investors **and** Investors' lender. *See* Affidavit of Tadd Miller ¶ 6, Appellant's App. at 97. No closing took place on June 28, 2002.

On July 1, 2002, Winterton's counsel sent a letter to counsel for Investors stating that Winterton would not agree to any extensions for closing the transaction and that obtaining the estoppels for Investors' lender was not Winterton's obligation. *See* Appellant's App. at 120. In response, Investors' counsel suggested the parties extend the closing a short period of time in order for Winterton to obtain the outstanding estoppels. Counsel also stated that Investors would be willing to close if there were only 3 or 4 outstanding estoppels. *See* Appellant's App. at 180. The transaction was not closed, and the trial court, in granting summary judgment for Investors, found that Winterton breached the Purchase Agreement by changing the date of closing.

While the contract states that time is of the essence, the actions of the parties are indicative of some understanding of a waiver of the essence clause, and Investors admits that this is the case. *See* Appellee's Brief at 39–40. Moreover, and more specifically, Investors waived the closing date of June 28, 2002, when it responded to Winterton's notification of the change of the date of closing. In his Memorandum dated June 27, 2002, Miller, on behalf of Investors, informed Winterton that Investors would not be ready to close on July 1,

2002, because it did not have all the estoppel certificates. In his Memorandum, Miller did not mention the closing set for June 28, 2002, the day following the day on which he communicated with Winterton's counsel, and we surmise, realistically, that if Investors was not ready to close on July 1, 2002, it was not ready to close three days *prior* on June 28, 2002. Accordingly, we conclude that Winterton did not breach the Purchase Agreement by unilaterally changing the closing date.

### III. TERMINATION/EXPIRATION OF PURCHASE AGREEMENT

Brown asserts that, contrary to the trial court's findings, the Purchase Agreement terminated and/or expired such that the Back-up Purchase Agreement is the operative contract for the sale of the real estate. The trial court found that "the [Purchase Agreement] did not terminate and therefore the [Back-up Purchase Agreement] did not come into effect." Trial Court's Findings of Fact and Conclusions of Law # 35, Appellant's App. at 31.

On appeal, then, we must determine whether the Purchase Agreement terminated, as required by the Back-up Purchase Agreement, in order for the Back-up Purchase Agreement to become the operative contract for this particular piece of real estate. The Back-up Purchase Agreement provides: "Purchaser acknowledges that the Real Estate is subject to a binding purchase agreement existing as of the date hereof between Seller and an undisclosed third party (the 'Prior Contract') and Purchaser and Seller acknowledge and agree that Seller's obligation to sell and deliver title to the Real Estate to Purchaser hereunder is *subject to the expiration or termination of such Prior Contract*, the date of such expiration or termination being the Prior Contract Termination Date." Contract for Purchase

of Real Estate 1(11, Appellant's App. at 135 (emphasis supplied). Yet, the Back-up Purchase Agreement neither defines the terms "termination" and "expiration" nor identifies events that would be considered to terminate the Purchase Agreement or cause the Purchase Agreement to expire. The Back-up Purchase Agreement does contain provisions regarding termination, but they are provisions for the termination of the Backup Purchase Agreement. They are not provisions relating to the termination of the Purchase Agreement, which is our concern in this case. Consequently, the Back-up Purchase Agreement contemplates the termination or expiration of the Purchase Agreement either by its own terms or otherwise.

However, the Purchase Agreement does not contain a provision for termination. Our review of the Purchase Agreement discloses mere mention of termination in only two provisions. The first provision addresses the handling of the earnest money. *See* Purchase Agreement ¶ 2(ii)(y), Appellant's App. at 75. This sub-section of paragraph 2 addresses the return of the earnest money to the purchaser (i.e., Investors) if the Purchase Agreement terminates. Nevertheless, the provision neither defines the term nor identifies termination-causing events. The second provision mentioning termination and contained in the Purchase Agreement is entitled "condemnation." Paragraph 10 discusses condemnation and allows for the purchaser (i.e., Investors) to terminate the contract in the event of condemnation of part or all of the property prior to closing. *See* Purchase Agreement ¶ 10, Appellant's App. at 79. Again, it contains no information as to the meaning of the term termination or events constituting termination. Thus, the Purchase Agreement provides no guidance as to the definition of the term "termination" or events causing termination as

called for in the Back-up Purchase Agreement.

For clarification, we note that termination of a contract is different from a breach of contract. Generally, when a contract is terminated, neither party has any further duties or obligations under the contract. *Orthodontic Affiliates, P.C. v. Long,* 841 N.E.2d 219, 222 (Ind.Ct.App. 2006). On the other hand, when a party breaches a contract, that party may be required to compensate the other party for damages resulting from the breach. *Id.* Therefore, until the breach is taken care of, the contract is not terminated. In some cases, the breach is dealt with, and the contract is still performed. In other instances, the breach is dealt with, and the contract terminates.

In the present case, there was an alleged breach, but no termination. The designated evidence shows that although Investors was claiming that Winterton had breached, the parties were continuing to discuss terms under which the Purchase Agreement could proceed to closing. This discussion period was from July 1, 2002 to August 7, 2002, when Investors filed suit. During this period, Winterton and Investors were attempting to deal with the alleged breach so that the contract could still be performed. In addition, the parties still owed certain obligations to each other. As a result, there was no termination of the contract during this time.

Furthermore, once Investors filed suit there could be no termination. The parties still had certain obligations to each other with respect to the contract, and they were asking the court to aid them in determining the specific parameters of those obligations. Moreover, Winterton could not sell property that was the subject of a lawsuit. This is especially true in this case where Investors filed suit requesting specific performance, i.e., that it

be allowed to purchase the real estate. If the lawsuit ended in its favor, Investors planned to buy the property. Accordingly, the trial court properly determined that the Purchase Agreement did not terminate.

Moreover, the Back-up Purchase Agreement set no time limit for the occurrence of the termination of the Purchase Agreement. Rather, the only time limits set forth in the Back-up Purchase Agreement were those triggered by the termination of the Purchase Agreement. "When the parties to an agreement do not fix a concrete time for performance, the law implies a reasonable time." *Harrison v. Thomas*, 761 N.E.2d 816, 819 (Ind.2002), *trans. denied.* What constitutes a reasonable time depends upon the subject matter of the contract, the circumstances attending the performance of the contract, and the situation of the parties to the contract. *Id.*

At the time the Back-up Purchase Agreement was signed, the Purchase Agreement was set to close on March 15, 2002. The Third Amendment to the Purchase Agreement extended the closing to June 28, 2002. The Back-up Purchase Agreement provided that time is of the essence and that the transaction should be closed not later than sixty (60) days after the expiration of the contingency period. *See* Contract for Purchase of Real Estate ¶¶ 20 and 3, Appellant's App. at 137 and 128. Further, the Back-up Purchase Agreement provided that the purchaser (i.e., Brown) would have the right to extend the contingency period for up to ninety (90) days if necessary. Thus, although the parties to the Back-up Purchase Agreement contemplated at least the possibility of some delay by their inclusion of the provision whereby the contingency period could be extended, they limited all extensions to an aggregate of ninety (90) days. Therefore, without attempting to set specific parameters for what is to be considered a reasonable time, it does not appear from the terms of their agreement that the parties could have considered several years to be a reasonable time. Accordingly, the Back-up Purchase Agreement has lapsed and is no longer enforceable.

### CONCLUSION

Based upon the foregoing discussion and authorities, we conclude that the trial court erred by entering summary judgment in favor of Investors and against Winterton. We conclude that Winterton did not breach the Purchase Agreement either by not providing estoppel certificates and subordination agreements to Investors or by changing the closing date. Thus, the trial court's entry of summary judgment and damages in favor of Investors and against Winterton is reversed and summary judgment shall be entered in favor of Winterton.

Further, we conclude that the trial court properly determined that the Purchase Agreement did not expire or terminate as required by the Back-up Purchase Agreement and, therefore, the Back-up Purchase Agreement did not come into effect. We affirm the trial court's entry of summary judgment in favor of Investors and Winterton and against Brown.

Reversed in part, affirmed in part, and remanded to the trial court for further proceedings consistent with this opinion.

MAY, J., and CRONE, J., concur.