

FILED

Oct 13 2017, 7:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James D. Johnson
Jackson Kelly, PLLC
Evansville, Indiana

ATTORNEYS FOR APPELLEE

David L. Jones
David E. Gray
Jones • Wallace, LLC
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brenda Sue Gittings and Marc Richmond Gittings, *Appellants-Respondents,* v. William H. Deal, *Appellee-Peetitioner.* | October 13, 2017<br><br>Court of Appeals Case No. 74A01-1611-TR-2551<br><br>Appeal from the Spencer Circuit Court<br><br>The Honorable Jonathon A. Dartt, Judge<br><br>Trial Court Cause No. 74C01-1305-TR-27 |

**Barnes, Judge.**

## Case Summary

[1]     Brenda Sue Gittings and Marc Gittings ("the Gittingses") appeal the trial court's judgment in favor of William Deal. We affirm.

# Issues

The Gittingses raise three issues, and we address the following two issues:

    I.        whether the trial court's findings that the Gittingses' claims are barred by the statute of limitations are clearly erroneous; and

    II.      whether the trial court's findings that transfers of property from the NDR Primary Trust to the NDR Trust A and from the NDR Trust A to the GLR Trust were proper are clearly erroneous.

# Facts

Brenda is the daughter of Nile D. Richmond, and Marc Gittings is Brenda's son and Nile's grandson. In 1985, Nile married Georgia L. Richmond, who also had a prior child, William. Prior to their wedding, they signed an Antenuptial Agreement, which provided that all property acquired after marriage would be owned as community property and that, after their death, one-half of the community property would pass to each estate. In 1988, Nile and Georgia acquired property and mineral interests in West Virginia ("West Virginia Properties").

In 1993, Nile and Georgia retained Attorney David E. Price to prepare trusts for them. Nile executed the NDR Trust Agreement, and Georgia executed the GLR Trust Agreement. Nile and Georgia funded the trusts with half of the parties' assets being placed in each of the respective trusts. The Trust Agreements had substantially identical terms. The Trust Agreements provided:

[D]uring the life of the Settlor, the Settlor shall have the power to completely revoke or terminate this Trust Agreement, at any time, by an instrument signed by the Settlor and delivered to the Trustees during the life of the Settlor. In addition, during the life of the Settlor, the Settlor shall have the power to alter or amend this Trust Agreement, in whole or in part, at any time and from time to time, by an instrument signed by the Settlor, and delivered to the Trustees.

Exhibits Vol. IV pp. 22, 46. Additionally, the Trust Agreements provided that they could not be "changed orally, but only by a written agreement of the parties hereto." *Id.* at 37, 61. Upon the death of the Settlor, the Trust Agreement became "irrevocable." *Id.* at 21, 45.

[5] Each Trust Agreement created three separate trusts—the Primary Trust, Trust A, and Trust B. The Primary Trust was established to hold the primary trust estate during the life of the Settlor (Nile in the NDR Trust Agreement and Georgia in the GLR Trust Agreement). Upon the Settlor's death, the Primary Trust estate was to be distributed to Trust A and Trust B. Trust A was designed to be a Q-TIP trust and qualify for a marital deduction to minimize the federal estate tax. Trust A was to be funded with

the smallest fraction of the assets of Settlor's estate that qualify for the federal estate tax marital deduction as will be sufficient to result in the lowest federal estate tax being imposed upon [the] estate after allowing for the unified credit, and any other allowable credits and deduction, but in no event shall Trust A be less than the smaller of $100,000.00 or the balance of the Primary Trust.

*Id.* at 24, 48. Trust A was to be used to provide for the support, maintenance, and health of the Settlor's spouse.

[6] The remainder of the Primary Trust's assets were to be distributed to Trust B. Upon the surviving spouse's death, the remainder of Trust A was also to be distributed to Trust B. In the event that the Settlor's spouse predeceased the settlor, upon the Settlor's death, the Primary Estate's assets were to be transferred to Trust B. Upon the death of both the Settlor and the Settlor's spouse, Trust B was to be distributed as follows: one-third to Brenda, one-third to William, and one-third to the grandchildren of the Settlor and Settlor's spouse.

[7] Initially, the Trust Agreements provided that Nile and Georgia were the Trustees of both Primary Trusts. The Trust Agreements then provided:

> As to the primary trust during the life of the Settlor, either of the initial Trustees may resign by giving ten (10) days written notice to the other Co-Trustee. Upon such event or if either initial Co-Trustee otherwise ceased to continue to be qualified during the life of Settlor, then the remaining Trustee shall be the sole Trustee. If both the initial Co-Trustees cease to be qualified, then William H. Deal and Brenda Sue Gittings, or the survivor thereof, shall be the Co-Trustee. Sandra Deal shall be the next alternate successor Trustee.
>
> Upon the death of the Settlor, if he is survived by his spouse, then she along with William B. Deal and Brenda Sue Gittings, shall serve as Co-Trustees of Trust A and Trust B. If William H. Deal and Brenda Sue Gittings decline to act or are unable to act,

Sandra Deal shall be the alternate Co-Trustee of Trust A and Trust B.

Upon the death of Settlor's spouse, or upon the death of Settlor if his spouse predeceased him, William H. Deal and Brenda Sue Gittings, or the survivor therof, shall be the Co-Trustees of Trust A and Trust B. Sandra Deal shall be the alternate Trustee. In no event shall the surviving spouse serve as sole Trustee after the death of Settlor.

*Id.* at 32-33, 56-57. The Trusts also provided: "Upon the death of the Settlor, the Trustees shall divide the trust estate of the Primary Trust . . . into separate trust estates [Trust A and Trust B]." *Id.* at 22, 46.

[8] Nile died on January 24, 1995. Georgia then distributed property from the NDR Primary Trust to the NDR Trust A and NDR Trust B without consulting Brenda or William.

[9] On October 5, 1995, Georgia executed a First Amendment to the GLR Trust and eliminated Brenda as a beneficiary and as a trustee. That First Amendment was prepared by Attorney Price. Georgia did not inform Brenda of the amendment. On the same day, with the assistance of Attorney Price, Georgia transferred a one-half interest in the West Virginia Properties from the NDR Primary Trust to the NDR Trust A. Georgia then sent Brenda a copy of the NDR Trust and asked Brenda to sign and return four deeds and an assignment regarding the West Virginia Properties to transfer the properties from the NDR Trust A to the GLR Primary Trust.

[10]  Brenda consulted with her attorney, who requested relevant documents from Attorney Price. On November 20, 1995, Attorney Price provided some relevant documents to Brenda's attorney, but he did not provide copies of the GLR Trust or its Amendment or inform Brenda's attorney that Brenda had been eliminated as a beneficiary of the GLR Trust.

[11]  On December 28, 1995, Georgia and William signed deeds as trustees of the NDR Trust A purporting to transfer the West Virginia properties from the NDR Trust A to the GLR Primary Trust. Those documents were prepared by Attorney Price. After consulting with her attorney, on December 29, 1995, Brenda signed the deeds that had been sent to her as co-trustee of the NDR Trust and sent the documents to Attorney Price. The deeds signed by Brenda were not recorded at that time. Brenda did not know that the West Virginia properties were being transferred to a trust in which she did not have an interest. Although there are some documents in Attorney Price's records that indicate the GLR Primary Trust was purchasing the property from the NDR Trust A, no funds were transferred into any of the NDR trusts to compensate the trusts for the properties. Ultimately, Brenda received a distribution of approximately $90,000 from the NDR Trust B, and Marc received a distribution of approximately $22,000.

[12]  In November 1996, Georgia executed a Second Amendment to the GLR Trust Agreement that again changed the beneficiaries and left William as the sole beneficiary if living and, otherwise, to his descendants, per stirpes. Georgia died on March 4, 1997.

[13]   In July 1997, Brenda received a copy of the GLR Trust Agreement and the First and Second Amendments and learned that she and Marc had been eliminated as beneficiaries. In the fall of 1997, according to Brenda, William told Brenda and her husband that "there wasn't anything left [of the inheritance] after they paid the medical bills, the nursing home bills, and the funeral bills." Tr. Vol. II p. 22. Brenda believed that all of the money put into the trusts had been used to care for Georgia. However, in December 1997, William deeded the West Virginia properties, which were held by the GLR Trust, to himself.

[14]   In 2010, some of the oil and gas interests started producing significant amounts of income. By the time of the trial in this matter, William had received more than three million dollars in royalties, rental payments, and lease payments related to the West Virginia Properties. In September 2011, Brenda was contacted by an attorney and learned that William had transferred the West Virginia properties to himself in 1997. In June 2012, William recorded the deeds that Brenda had signed in 1995 as co-trustee transferring the West Virginia Properties from the NDR Trust A to the GLR Primary Trust.

[15]   In May 2013, William filed a petition to docket the NDR Trust Agreement. William requested that the trust be docketed to approve "the execution, delivery and recording of the deeds herein referenced, and the partial distribution of Trust A outright to Settlor's spouse, Georgia L. Richmond, as being all within the terms of the subject trust and hence properly made pursuant to the trust terms and Indiana law." Appellants' App. Vol. II p. 48. William alleged that Brenda's claims were barred due to her "consent and participation" and due to

the statute of limitations. *Id.* at 49. In her answer and affirmative defenses, Brenda alleged in part that the transfers of the West Virginia Properties violated the terms of the trust agreements and were void and/or voidable, the transfers were induced by improper conduct, and Georgia and William had an adverse interest in the transactions. Brenda also filed a counterclaim alleging breach of a mutual estate plan/implied trust, breach of the trust agreement, self-dealing, breach of fiduciary duty, mismanagement of trust assets, tortious interference with an expectancy interest, fraud/misrepresentation by omission, negligent misrepresentation by omission, conversion, and failure to provide an accounting. William responded that the trusts were not mutual trusts and that Brenda's claims were barred by the statute of limitations. Marc filed a petition to intervene, which the trial court granted.

[16] After a bench trial, the trial court entered findings of fact and conclusions thereon in favor of William as follows:

1.  The Primary Trusts of Nile and Georgia by their terms were each revocable during the life of the Settlor. There was no mutual estate plan that created an implied trust and no binding agreement between Nile and Georgia that their Trusts could not be amended. No evidence was produced at trial to support these claims by [Brenda and Marc].

2.  Georgia as the Trustee of the Nile Primary Trust exercised her authority to transfer assets from the Primary Trust into Trusts A and B, and to determine the allocation of assets for the marital deduction trust with Q-TIP (Trust A). Brenda, William, and Georgia were Co-trustees of Trust

A—not the Primary Trust. Until Trust A and Trust B were funded, the duties of the Co-trustees were not activated. In any event, Respondent, Brenda, had notice and knowledge of these transfers and made no timely objection to same in 1995. Any such objection made in 2013 is waived and time-barred. I.C. 30-4-6-14 and I.C. 29-1-14-1(a).

3. Georgia had authority pursuant to Article II(F) of her Primary Trust to amend the Trust to eliminate Brenda and her offspring as beneficiaries. Georgia had no duty or obligation to inform Brenda or her offspring that she chose to amend her Primary Trust to eliminate them as beneficiaries. Respondents had the burden of proof on each of their Counterclaims. *McGinnis v. Boyd*, 42 N.E. 678. Respondents wholly failed to produce any evidence at trial that the transfer of property from the Nile Trust A to the Georgia Primary Trust was not for the "support, maintenance or health" of Georgia.

4. Georgia's actions as the surviving spouse—beneficiary and Trustee were vested with broad discretion under the terms of the Nile Trust A. . . .

5. Georgia clearly had the authority and discretion to transfer assets from the Georgia Trust A to herself or the Georgia Primary Trust. The uncontradicted evidence at trial established an inference that Georgia transferred assets from the Nile Trust A for reasons of and concern for her support, maintenance, and health. Respondents had the burden of proof on their claims that the said transfers were contrary to the terms of Nile Trust A. Respondents wholly failed to produce any evidence to support their claims.

\* \* \* \* \*

7. Article III(B) manifests the intent of Nile that the wishes of the Settlor's spouse shall prevail regarding the operation or management of his Trust A. Article III(D) manifests the intent of Nile during the life of Settlor's spouse the Trustees may distribute to the Settlor's spouse all or any portion of the principal of Trust A to provide for the support, maintenance, and health of the Settlor's spouse and, in the event of any disagreement among the Trustees regarding the distribution of principal, the decisions of the Settlor's spouse shall in all events control.

8. Georgia had no conflict of interest because she clearly had the right to distribute all of the principal of the Nile Trust A for her own support, maintenance and health of the Settlor's spouse and the decisions of the Settlor's spouse in all events controlled (Article III(D) Nile Primary Trust). If this provision or the fact Georgia was a beneficiary of Nile's Trust, as well as a Co-trustee, has the appearance of a conflict of interest, the Settlor, Nile, was well aware of the authority he was giving to Georgia to make such transfers.

9. When evaluating the actions of a trustee and the trustee has been vested with discretion, the Court will not disturb the trustee's determinations unless there has been an abuse of that discretion. *Goodwine v. Goodwine*, 819 N.E.2d 824, 828 (2004).

10. Each of the Co-trustees, William and Brenda, signed the instruments conveying the West Virginia Property from the Nile Trust A to the Georgia Primary Trust. Georgia had no duty to tell either William or Brenda that she had amended her Primary Trust. Moreover, Brenda had legal counsel throughout these transactions to advise her of the legal ramifications of the documents she was signing and legal actions she could take to challenge or contest these

transactions. Brenda, as a co-trustee represented by legal counsel, did not challenge the transfer of property at the time based upon either a conflict of interest claim or a breach of fiduciary duty claim. If the transfer from the Nile Trust A to the Georgia Primary Trust was a conflict of interest and/or a breach of fiduciary duty, it would have been so at the time of the transfer in 1995 and without regard to any amendment of the Georgia Primary Trust.

11. The Court finds that as a matter of law from the evidence presented, Georgia did not purchase property from the Nile Trust A. Insufficient evidence was presented to substantiate that property was "actually" purchased from Nile Trust A.

12. The Court further finds that there was no misrepresentation by Georgia or William relevant to the issues in the case. There was no breach of fiduciary duty or failure to disclose by Georgia or William in their capacities as Trustees and Co-trustees. Under Indiana Law and Indiana Statutes such as I.C. 30-4-3 et. seq., the law and statutes on Conflict of Interest or Breach of Fiduciary Duty have an exception if such transaction is specifically authorized by the terms of the trust. *See i.e.* I.C. 30-4-3-5(a)(3).

13. Each of the Counterclaims is barred by applicable statutes of limitations, statutes of repose and laches. Brenda had two (2) years within which to bring her claims against Georgia and/or William for her claims of Tortious Interference of Expectancy Interest, Negligent Misrepresentation by Omission, and Conversion. I.C. 34-11-2-4(2). Actions for relief against fraud must be commenced within six (6) years after the cause of action has accrued. I.C. 34-11-2-7(4). Breach of trust claims

alleging damages to an interest in real property must be brought within six (6) years. I.C. 34-11-2-7(3).

14. On July 14, 1997, Brenda's causes of action, if any, accrued, at the latest, when she realized and clearly understood, after she reviewed Georgia's Primary Trust and Amendments, that she was excluded from receiving any further property pursuant to the terms of that Trust. By her own testimony at trial, Brenda also knew at that time that all of the property from the Nile Trust A had been transferred to the Georgia Primary Trust and, pursuant to the Amendments, William was the only beneficiary of the Georgia Primary Trust.

\* \* \* \* \*

22. In summary, although the results of Georgia's transfers and Amendments may not "now" seem fair and equitable, they were and are allowed by the plain language of the Revocable Trust Agreements signed by Nile and Georgia. Georgia was the sole trustee of Nile's Primary Trust when he died until she funded Nile Trust A and Nile Trust B at which time Brenda and William became co-trustees with her. As sole trustee, she had discretion in consulting with her attorneys as to which assets to place from Nile's Primary Trust into Nile's Trust A. Pursuant to Article II (I) and Article V(I) of the Trust the Court finds the term "Trustees" referred to are initially the Settlor and the Settlor's spouse as stated in the first paragraph of the Trust and do not include William and Brenda as Co-Trustees until Trusts A and B are funded pursuant to Article V(I). The transfer of property from Nile Primary Trust to Nile Trust A was proper.

23. Next, the transfer of property from Nile Trust A to Georgia's Primary Trust was allowed as Trust A was to some extent for Georgia's benefit to help pay taxes and pursuant to Article III(D) if deemed necessary for her support, maintenance, and health. A transfer from Nile Trust A to Georgia Primary Trust did require the consent of the cotrustees, William and Brenda. They gave that consent as to the disputed property by signing the deeds transferring the West Virginia property from Nile Trust A to Georgia Primary Trust. Around that time, the evidence is that Georgia was diagnosed with cancer and facing having a kidney removed. The Court cannot say that this transfer was improper as there was evidence to support it and Brenda did not present contrary evidence. Furthermore, although more information could have been shared between the parties, Georgia got the consent for the transfers in that all parties signed the West Virginia deeds from Nile Trust A to Georgia Primary Trust. No one objected and even if they would have, under Article III(D) Georgia's decision was controlling. Brenda also had the advice of counsel in consenting to this transfer.

24. Thereafter, even if all the assets in Georgia's Primary Trust that were transferred from Nile's Trust A were not used for her health and maintenance, she had the right to amend (or even revoke) her Trust pursuant to Article II(F).

Appellants' App. Vol. II pp. 34-42. The Gittingses now appeal.

# Analysis

[17] The Gittingses challenge the trial court's judgment for William. Generally, when, as here, a trial court enters findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard of review.

*Smith v. Smith*, 938 N.E.2d 857, 860 (Ind. Ct. App. 2010). First, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Id.* We disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. *Id.* We do not reweigh the evidence. *Id.* Rather, we consider only the evidence favorable to the trial court's judgment. *Id.* Those appealing the trial court's judgment must establish that the findings are clearly erroneous. *Id.* Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. *Id.* We do not defer to conclusions of law, however, and evaluate them de novo. *Id.*

[18]   The parties' arguments require that we interpret the Trust Agreements, which are written contracts. "'The construction of a written contract is a pure question of law.'" *The Winterton, LLC v. Winterton Inv'rs, LLC*, 900 N.E.2d 754, 759 (Ind. Ct. App. 2009) (quoting *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 501 (Ind. Ct. App. 2007)), *trans. denied*. Our duty is to interpret a contract to ascertain the intent of the parties. *Id.* "When interpreting a contract, we attempt to determine the intent of the parties at the time the contract was made by examining the language used in the instrument to express their rights and duties." *Id.* Where the language of the contract is unambiguous, we determine the parties' intent from the four corners of the document. *Id.* The unambiguous language of a contract is conclusive upon the parties to the contract as well as upon the court. *Id.* We will neither construe unambiguous provisions nor add provisions not agreed upon by the parties. *Id.*

A contract is ambiguous when a reasonable person could find its terms susceptible to more than one interpretation. *Id.* If a contract is ambiguous, its meaning is to be determined by extrinsic evidence and its construction is a matter for the fact finder. *Id.* When trying to ascertain the intent of the parties, we will read the contract as a whole. *Id.* Additionally, we will make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Id.* We must accept an interpretation of the contract that harmonizes its provisions rather than one that causes the provisions to conflict. *Id.*

## I. Statute of Limitations

The Gittingses argue that the trial court erred when it determined that their claims are barred by the statute of limitations. The Gittingses brought several counterclaims, including breach of a mutual estate plan/implied trust, breach of the trust agreement, self-dealing, breach of fiduciary duty, mismanagement of trust assets, tortious interference with an expectancy interest, fraud/misrepresentation by omission, negligent misrepresentation by omission, conversion, and failure to provide an accounting. The Gittingses bear "'the burden of bringing suit against the proper party within the statute of limitations.'" *Huff v. Huff*, 892 N.E.2d 1241, 1246 (Ind. Ct. App. 2008) (quoting *Beineke v. Chemical Waste Mgmt. of Ind., LLC*, 868 N.E.2d 534, 539-540 (Ind. Ct. App. 2007)), *as revised on reh'g*, 895 N.E.2d 407 (Ind. Ct. App. 2008).

Indiana Code Section 34-11-5-1 provides: "If a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action,

the action may be brought at any time within the period of limitation after the discovery of the cause of action." "[T]o invoke the protection provided by this statute, the wrongdoer must have actively concealed the cause of action and the plaintiff is charged with the responsibility of exercising due diligence to discover the claims." *Malachowski v. Bank One, Indianapolis*, 590 N.E.2d 559, 563 (Ind. 1992). "However, where the parties are in a fiduciary relationship, such as trustee/beneficiary, the concealment of the claim need not be active." *Id.* "A mere failure to disclose, when there is a duty to disclose, may be sufficient to toll the statute." *Id.*

[22] It is undisputed that the Gittingses did not become aware of Georgia's actions until July 1997, when Brenda discovered that Georgia had amended the GLR Trust Agreement to eliminate the Gittingses as beneficiaries. The trial court concluded that the Gittingses' "causes of action, if any, accrued" at this time. Appellants' App. Vol. II p. 38. The Gittingses argue that their causes of action did not accrue until 2011, when Brenda learned that William had misrepresented in 1997 that all of the GLR Trust assets had been used to pay for Georgia's support. According to the Gittingses, Brenda did not know that she was "damaged until 2011 when she learned that William Deal had transferred to himself the West Virginia properties and that they were not used for proper trust purposes." Appellants' Reply Br. p. 9.

[23] "Under Indiana's discovery rule, 'a cause of action accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of

the tortious act of another.'" *Custom Radio Corp. v. Actuaries & Benefit Consultants, Inc.*, 998 N.E.2d 263, 268 (Ind. Ct. App. 2013) (quoting *Wehling v. Citizens Nat. Bank*, 586 N.E.2d 840, 843 (Ind. 1992)); *see also Malachowski*, 590 N.E.2d at 564. "For a wrongful act to give rise to a cause of action and thus to commence the running of the statute of limitations, it is not necessary that the extent of the damage be known or ascertainable but only that damage has occurred." *Custom Radio*, 998 N.E.2d at 268 (quoting *Shideler v. Dwyer*, 275 Ind. 270, 282, 417 N.E.2d 281, 289 (1981)).

[24] We have no trouble holding that the statute of limitations was tolled until July 1997, when Brenda became aware that Georgia had eliminated the Gittingses as beneficiaries. *See, e.g., Huff*, 892 N.E.2d at 1246-48 (holding that genuine issues of material fact existed regarding whether the trustee properly disclosed to the beneficiaries the material facts of the conveyance in accordance with his duty as trustee and that summary judgment on the expiration of the statute of limitations was inappropriate). At that point, however, Brenda was well aware that the properties had been transferred to a trust in which she was not a beneficiary and that she had been damaged. Although she may not have understood the extent of the damage until 2011, it was not necessary that the full extent of the damage be evident before the cause of action accrued. We conclude that, under any of the Gittingses' counterclaims, the statute of limitations would have run well before their claims were filed in 2013. While the result here is extremely regrettable and the behavior concerning these trust

assets is disturbing, we simply cannot say that the trial court's findings and conclusions regarding the statute of limitations are clearly erroneous.

## II. *Transfers of Property*

[25] Although the statute of limitations issue is dispositive here, we have significant concerns regarding the conduct of the trustees in this case. Consequently, we will address Georgia's transfers of property for guidance to future trustees. The Gittingses argue that Georgia's transfers of property from the NDR Primary Trust to NDR Trust A and from NDR Trust A to the GLR Trust were improper. We begin by addressing Georgia's transfer of assets from the NDR Primary Trust to Trust A. The trial court concluded that, at that time, Georgia was the sole trustee and had the discretion to allocate the funds as she wished. We disagree.

[26] Initially, the NDR Trust Agreement provided that Nile and Georgia were the Trustees. The Trust Agreement then provided:

> As to the primary trust during the life of the Settlor, either of the initial Trustees may resign by giving ten (10) days written notice to the other Co-Trustee. Upon such event or if either initial Co-Trustee otherwise ceased to continue to be qualified during the life of Settlor, then the remaining Trustee shall be the sole Trustee. If both the initial Co-Trustees cease to be qualified, then William H. Deal and Brenda Sue Gittings, or the survivor thereof, shall be the Co-Trustee. Sandra Deal shall be the next alternate successor Trustee.
>
> Upon the death of the Settlor, if he is survived by his spouse, then she along with William B. Deal and Brenda Sue Gittings, shall

serve as Co-Trustees of Trust A and Trust B. If William H. Deal and Brenda Sue Gittings decline to act or are unable to act, Sandra Deal shall be the alternate Co-Trustee of Trust A and Trust B.

Upon the death of Settlor's spouse, or upon the death of Settlor if his spouse predeceased him, William H. Deal and Brenda Sue Gittings, or the survivor therof, shall be the Co-Trustees of Trust A and Trust B. Sandra Deal shall be the alternate Trustee. In no event shall the surviving spouse serve as sole Trustee after the death of Settlor.

*Id.* at 32-33. The Trust also provided: "Upon the death of the Settlor, the Trustees shall divide the trust estate of the Primary Trust . . . into separate trust estates [Trust A and Trust B]." *Id.* at 22.

[27] The trial court determined that, upon Nile's death, Georgia was the sole trustee of the NDR Primary Trust. According to William, he and Brenda were only trustees of Trust A and Trust B, not the Primary Trust. However, this conclusion and argument conflict with the provision of the Trust Agreement that specifically provides: "In no event shall the surviving spouse serve as sole Trustee after the death of Settlor." Exhibits Vol. IV p. 32-33. Further, the Trust Agreement requires the "Trustees" to reallocate the assets from the Primary Trust to Trust A and Trust B and provides: "If the Settlor's spouse survives the Settlor, then upon the death of the Settlor, the *Trustees* shall initially divide the trust estate of the Primary Trust into two separate trusts, namely Trust A and Trust B, as hereinafter described, and shall distribute the trust estate as hereinafter described." *Id.* at 22, 23 (emphasis added). If it was intended that

Georgia be the sole trustee of the Primary Trust after Nile's death, the Trust Agreement could have provided so. The Trust Agreement, however, specifically required that Georgia not serve as the sole Trustee after Nile's death. Given these provisions, it is clear that, after Nile's death, Georgia, Brenda, and William were co-trustees of the NDR Primary Trust. Georgia acted improperly when she solely determined the distributions to Trust A and Trust B.

[28] Next, the Gittingses argue that Georgia's transfer of the West Virginia Properties from NDR Trust A to the GLR Primary Trust was improper. The trial court concluded that Georgia had the discretion under the Trust Agreements to transfer assets from NDR Trust A to her own trust for her support, maintenance, and health.

[29] The Gittingses point out that, at the time of the transfers in 1995, Indiana Code Section 30-4-3-5 provided:

> (a) If the duty of the trustee in the exercise of any power conflicts with his individual interest or his interest as trustee of another trust, the power may be exercised only with court authorization.

> (b) For the purposes of subsection (a) of this section, the interest of an affiliate of the trustee will be deemed to be the interest of the trustee.

Further, Indiana Code Section 30-4-3-7(d) provided:

> Unless the terms of the trust provide otherwise, the trustee may sell, exchange, or participate in the sale or exchange of trust

property from one (1) trust to himself as trustee of another trust, provided the sale or exchange is fair and reasonable with respect to the beneficiaries of both trusts and the trustee discloses to the beneficiaries of both trusts all material facts related to the sale or exchange which the trustee knows or should know.

[30] Finally, Indiana Code Section 30-4-3-19(b) provided:

The consent, acquiescence, agreement to release or discharge, affirmance, or participation by a beneficiary will not relieve the trustee from liability if:

(1) at the time it was given the beneficiary was under an incapacity;

(2) at the time it was given the beneficiary did not know of his rights or all of the material facts which the trustee knew or should have known;

(3) it was induced by the trustee's improper conduct;

(4) the trustee had an adverse interest in the transaction and the transaction was not fair and reasonable; or

(5) the trustee pays or delivers a beneficiary's interest to that beneficiary contrary to the terms of a trust with protective provisions.

[31] We also note that "[t]here is a broad rule of equity grounded upon the high duty of a trustee or fiduciary to his beneficiary or correlate which does not permit him to acquire an interest in the subject-matter of the trust to the prejudice and detriment of his beneficiary or correlate." *Washington Theatre Co. v. Marion*

*Theatre Corp.*, 119 Ind. App. 114, 125, 81 N.E.2d 688, 692 (1948). "Bad faith is presumed where a fiduciary acquires a conflicting interest to his beneficiary without such beneficiary's knowledge and consent. It is of no consequence whether fraud is intended under such circumstances." *Id.* at 132, 81 N.E.2d at 695.

[32] The transfer of property from NDR Trust A to the GLR Primary Trust was not done with the beneficiaries of both trusts having all material facts related to the transfer. Specifically, although Brenda signed the deeds at Georgia's request, Brenda was unaware that she had been eliminated as a beneficiary of the GLR Trust Agreement. Brenda, thus, was unaware that the properties were being moved to a trust in which that she had no interest. Further, because Georgia had eliminated other beneficiaries of the GLR Trust Agreement in favor of her son, Georgia's duty as a trustee of the NDR Trust Agreement conflicted with her interest as trustee of the GLR Trust Agreement. Consequently, we conclude that, under the statutes in effect at the time, court authorization was required to complete the transfer. *See, e.g., Huff*, 892 N.E.2d at 1246-48 (holding that a trustee's conveyance of property from the trust to himself was a conflict of interest that required court approval and that the trustee had a duty to disclose the material facts of the conveyance to the beneficiaries).

[33] William argues that court authorization was not required because of the "exceptionally broad authority" given to Georgia under the NDR Trust Agreement. Appellee's Br. p. 39. In discussing NDR Trust A, the Trust Agreement provides: "In the event there is any disagreement between the

Trustees regarding the distribution of principal from Trust A, the decisions of the Settlor's spouse shall, in all events, control." Exhibits Vol. IV p. 24. We must disagree.

[34] Despite the broad authority given to Georgia in the trust agreement, she was not given the authority to breach her fiduciary duties and transfer property in violation of statutory authority, and the discretion given to her under the agreement does not excuse her improper conduct. William cites no relevant authority that would excuse Georgia's conduct.[1] We conclude that the transfer of the properties from NDR Trust A to the GLR Primary Trust without court authorization and without the beneficiaries' knowledge of material facts was improper.

## Conclusion

[35] The trial court's finding and conclusion that the Gittingses' claims were barred by the statute of limitations is not clearly erroneous. Consequently, despite our reservations concerning the transfer of trust assets here, we affirm.

[36] Affirmed.

---

[1] William argues that Indiana Code Section 30-4-3-5 was later amended and does not require court approval if the power is authorized by the terms of the trust. William contends that amendments to the trust code should be applied "retroactively unless doing so would adversely affect beneficiary rights or relieve a person from a duty of liability imposed by the terms of the trust or under prior law." Appellee's Br. p. 42. Clearly, Georgia's conduct adversely affected the Gittingses' rights. We decline William's invitation to apply the amended statutes retroactively.

Baker, J., and Crone, J., concur.