

FILED
Nov 02 2018, 9:42 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Indiana Supreme Court

Supreme Court Case No. 18S-TR-231

## Brenda Sue Gittings and Marc Richmond Gittings,

*Appellants (Petitioners)*

—v—

## William H. Deal,

*Appellee (Respondent)*

Argued: April 24, 2018 | Decided: November 2, 2018

Appeal from the Spencer Circuit Court, No. 74C01-1305-TR-27
The Honorable Jonathan A. Dartt, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 74A01-1611-TR-2551

**Opinion by Chief Justice Rush**

Justices David, Massa, Slaughter, and Goff concur.

**Rush, Chief Justice.**

Sibling squabbles are commonplace and can be mild. But when disagreements arise over property after parents' deaths, rifts may become serious, with lengthy litigation separating family members. That is the case for stepsiblings Brenda Sue Gittings and William Deal.

Under the original terms of mirrored trusts that Brenda's father and William's mother created, once both parents died, the two stepsiblings were to share land, mineral interests, and other assets placed in the trusts. But after Brenda's father died, property transfers and amended trust terms left William with all the land and mineral interests upon his mother's death.

More than a decade later, the land started generating significant income through oil and gas leases, and Brenda claimed a share of the property and profits. William sought court approval of the property transfers that led to his receipt of the profitable land, and Brenda (with her son Marc) responded with numerous allegations challenging those property transfers and seeking affirmative relief.

After examining the trust agreements and the trustees' actions, we reach three holdings. First, Brenda and Marc's assertions are subject to statutes of limitations to the extent those assertions seek affirmative relief—but not to the extent they diminish or defeat William's request for declaratory relief. Second, fraudulent concealment did not toll the limitation periods on the Gittingses' claims seeking affirmative relief. And third, William is not entitled to court approval of the property transfers, as the transfers were improper.

## Facts and Procedural History

Nile and Georgia Richmond married in 1985. They had no children together, but each had a child from a previous marriage: Brenda Sue Gittings (Nile's daughter) and William Deal (Georgia's son).

## A. The trust agreements.

As part of their estate planning, Nile and Georgia executed two trust agreements, each identified by the settlor's name: the Nile D. Richmond Primary Trust Agreement ("NDR Trust Agreement"), with Nile as settlor; and the Georgia L. Richmond Primary Trust Agreement ("GLR Trust Agreement"), with Georgia as settlor. Each settlor, while alive, could modify his or her respective agreement, but when Nile and Georgia executed the agreements, the terms mirrored one another.

Each agreement set up a Primary Trust, a Trust A, and a Trust B. The NDR Trust Agreement thus established the NDR Primary Trust, NDR Trust A, and NDR Trust B. And the GLR Trust Agreement similarly established the GLR Primary Trust, GLR Trust A, and GLR Trust B. After executing the trust agreements, Nile and Georgia funded each primary trust with, among other assets, undivided one-half interests in land and minerals they owned in West Virginia and Indiana.

The primary trusts were inter vivos trusts, holding Nile's and Georgia's primary trust estates during each of their lives. Once the settlor died, the assets of that primary trust estate would be distributed to the respective Trust A and/or Trust B.

The initial trustees were the settlor and the spouse. But if the settlor died first, the surviving spouse would **not** be the sole trustee of Trust A and Trust B. The trust agreements made this explicit: "In no event shall the surviving spouse serve as sole Trustee after the death of [the] Settlor." Instead, after the settlor's death, the surviving spouse, "along with William H. Deal and Brenda Sue Gittings, shall serve as Co-Trustees of Trust A and Trust B."

Trust A—a marital-deduction trust with provisions removing certain discretion from the surviving spouse[1]—was designed to provide for the surviving spouse's support, maintenance, and health. It was to receive no less than the smaller of $100,000 or the balance of the settlor's primary trust. Once the surviving spouse died, assets remaining in Trust A would go into Trust B.

Apart from receiving any Trust A leftovers, Trust B was set up to receive two other classes of assets: those transferred directly to Trust B by the decedent settlor's last will, and those remaining in the settlor's primary trust estate after its distribution to Trust A.

Trust B would be distributed after both the settlor's and the spouse's deaths. Each trust agreement originally instructed that the assets collected in its Trust B be distributed in thirds: one third to Brenda, one third to William, and one third divided equally among Nile's and Georgia's grandchildren.

## B. The amended agreement and the property transfers.

Nile died in January 1995, leaving Georgia as the surviving spouse and co-trustee—with Brenda and William—of NDR Trust A and NDR Trust B.

About six months later, Brenda gave birth to her son, Marc. Concerned about whether Marc—having been born after Nile's death—was part of the beneficiary class of grandchildren, Brenda asked Georgia for a copy of "the trust." At this point, although Brenda's understanding was that Nile and Georgia had each created a separate trust, she didn't know details about their terms; she had neither received a copy of the NDR Trust Agreement from Nile nor seen a copy of the GLR Trust Agreement. Based

---

[1] These provisions are known as Qualified Terminable Interest Property, or Q-TIP, provisions. *See* 26 U.S.C. § 2056(b)(7) (2012). Congress added Tax Code section 2056(b)(7)—defining and governing qualified terminable interest property—"primarily to allow a decedent to provide for a surviving spouse while controlling the ultimate disposition of the property after the surviving spouse's death." *Estate of Spencer v. Comm'r*, 43 F.3d 226, 229 (6th Cir. 1995).

on what her father told her, Brenda thought that "[a]fter [Nile's] death whatever was in his trust would go into Georgia's for safekeeping."

Soon after Brenda requested "the trust," Georgia distributed the NDR Primary Trust estate to NDR Trust A and NDR Trust B, and amended the GLR Trust Agreement, removing Brenda and Marc as beneficiaries.

Georgia next sent Brenda a copy of the NDR Trust Agreement along with four deeds, a lease assignment, and a note asking Brenda to sign and return the deeds and assignment. The deeds and assignment referenced the GLR Trust Agreement and purported to convey the one-half interests in West Virginia and Indiana property from NDR Trust A to "Georgia L. Richmond, as Trustee . . . under a Trust Agreement . . . known as the [GLR Trust Agreement]." Georgia did not, however, send Brenda a copy of the GLR Trust Agreement, original or amended.

Seeking advice, Brenda turned to legal counsel at the office where she worked as a paralegal. Brenda's counsel sent a letter to Georgia's attorney, explaining that Brenda sought to determine "her status under her father's Will and his Primary Trust Agreement," and acknowledging that Brenda had received a copy of "the Trust Agreement" from Georgia. In the letter, Brenda's counsel also asked Georgia's attorney for documents "bearing materially upon Brenda's interest as trustee or beneficiary."

Georgia's attorney responded with documents related to the NDR trust assets. He listed the assets in NDR Trust A, explained that "[NDR] Trust B contains the rest and remainder of the Primary Trust," and set out the assets in Trust B. But he did not include the GLR Trust Agreement, believing that he was not authorized to disclose Georgia's information to a third party.

Although neither Brenda nor her counsel had seen the GLR Trust Agreement that the deeds and assignment referenced, Brenda signed the deeds and assignment, and her attorney sent them to Georgia's counsel. Georgia and William signed similar deeds—not the same documents that Brenda signed, but ones that likewise purported to transfer the West Virginia and Indiana property from NDR Trust A to Georgia as trustee under the GLR Trust Agreement.

Georgia died in March 1997. Her death triggered distribution of the NDR trust estate through NDR Trust B—in thirds to Brenda, William, and the grandchildren, including Marc. In June 1997, Brenda signed the final account and petition to settle and close NDR Trust B. This document showed that the trust estate would be completely depleted upon the "final distribution" of the "balance in trust" to Brenda, William, Marc, and the other grandchildren. Under that distribution—outlined in the accounting—Brenda and William each received almost $91,000 and each grandchild received approximately $22,710 placed in individual trusts.

Not long after Brenda signed the final account, an attorney who helped administer NDR Trust B and who handled the administration of Georgia's estate sent Brenda a copy of the amended GLR Trust Agreement. When Brenda received it around July 14, 1997, she learned that she and Marc had been eliminated as beneficiaries and that everything in the GLR trust would go to William. As the GLR trust's sole beneficiary, William received the property that the deeds—both the ones that Brenda signed and the ones that William and Georgia signed—purported to transfer in 1995 from NDR Trust A to Georgia as trustee of the GLR Primary Trust.

After receiving the GLR Trust Agreement and learning that she and Marc were not beneficiaries, Brenda was "pretty downtrodden for quite a while." But she did not turn to her legal counsel for advice about the GLR Trust Agreement and its amendments. Nor did she bring any claims at that time or object to the executor's final account and petition to settle Georgia's estate.

Sometime around that fall at a family gathering, Brenda's husband—with Brenda there—asked William about any more inheritance. William responded that there wasn't anything left after Georgia's medical, nursing home, and funeral bills had been paid.

About thirteen years later, in 2010, the property in West Virginia that William received from the GLR trust began producing significant income—hundreds of thousands of dollars annually—from oil and gas leases. Over the next couple of years, Brenda consulted with an attorney and sent William a letter, making claims on the property.

William found among his mother's things the deeds that Brenda signed in 1995 and, after consulting with his own attorney, recorded them in June 2012.

## C. Court proceedings.

In 2013, William petitioned the trial court to docket the NDR Trust Agreement and to grant him declaratory relief by approving the transfers of the land and mineral interests from NDR Trust A to Georgia as trustee under the GLR Trust Agreement. He also asked the court to find that Brenda knew about and consented to the transfers, and—based on that consent and the statutes of limitations—to preclude Brenda from bringing claims for breach of trust and for recovery of real estate.

The court allowed Marc Gittings (Brenda's son) to intervene, and the Gittingses responded to William's petition with defenses and counterclaims. They alleged in part that the property transfers violated the terms of the NDR Trust Agreement, making the transfers void or voidable, and that Brenda's actions did not validate the transfers because Georgia and William transferred the property without giving Brenda all material information. They also asked the court to—among other things—deny William court approval of the transfers, void the transfers, and award the Gittingses compensation for acts that led to William's sole receipt of the property.

After a bench trial, the court issued findings of fact and conclusions of law and entered judgment in William's favor. It determined that the property transfers were proper under the terms of the NDR Trust Agreement and under Indiana law. It also concluded that the Gittingses' counterclaims were time barred. The Gittingses appealed.

A panel of the Court of Appeals affirmed judgment for William, concluding that the statutes of limitations bar the Gittingses' claims. *Gittings v. Deal*, 84 N.E.3d 749, 761 (Ind. Ct. App. 2017). Although the panel found the statutes-of-limitations issue dispositive, it nonetheless addressed the validity of the property transfers, out of concern about the trustees' conduct. *Id.* at 758. In doing so, it concluded that the transfers

were improper under the NDR Trust Agreement and the Trust Code. *Id.* at 759–61.

The Gittingses petitioned to transfer. After hearing oral argument, we granted transfer—vacating the Court of Appeals decision, Ind. Appellate Rule 58(A)—and referred the case to mediation, App. R. 20. The parties participated in mediation but did not reach an agreement.

## Standard of Review

Because the trial court entered findings of fact and conclusions of law, we review the findings and the judgment for clear error. Ind. Trial Rule 52(A). This means that the evidence must support the findings and the findings must support the judgment. *Oil Supply Co. v. Hires Parts Serv., Inc.*, 726 N.E.2d 246, 248 (Ind. 2000). We set aside the findings only if the record contains no supporting evidence, but we review the court's legal conclusions de novo. *Gertiser v. Stokes (In re Marriage of Gertiser)*, 45 N.E.3d 363, 369 (Ind. 2015).

We also review de novo the court's interpretations of statutes and trust instruments, as they are matters of law. *Fulp v. Gilliland*, 998 N.E.2d 204, 207 (Ind. 2013).

## Discussion and Decision

We first confront a threshold issue: whether the Gittingses' responses to William's petition are subject to statutory time limits. After observing that the Gittingses' responses bear characteristics of both actions and defenses, we conclude that their responses are subject to statutory time limits to the extent they pursue affirmative relief, but not to the extent they seek to defeat or diminish William's claim to declaratory relief.

We next address whether fraudulent concealment tolled the limitation periods for the Gittingses' claims seeking affirmative relief. We conclude that because the asserted causes of action were not concealed, fraudulent concealment did not toll the limitation periods to make the claims timely.

What remains, then, are the Gittingses' attempts to diminish or defeat William's claim for court approval of the property transfers. After evaluating the propriety of the transfers that led to William's receipt of the property, we determine that William is not entitled to the declaratory relief he seeks.

## I. Claims are subject to statutory time limits to the extent they seek affirmative relief, but not to the extent they function as defenses.

After William petitioned in 2013 for court approval of the property transfers, the Gittingses responded with "affirmative defenses" and ten counterclaims. In both their defenses and their counterclaims, the Gittingses maintained that the transfers were improper. In their counterclaims, they asserted causes of action including breach of trust, breach of fiduciary duties, tortious interference with expectancy interest, fraud, negligent misrepresentation, and conversion. They also asked for affirmative relief, including an order compelling William to distribute shares of the property and income to Brenda and Marc.

William argues that both the Gittingses' "affirmative defenses" and their "counterclaim[s]" are time barred by statutes of limitations and nonclaim statutes. He reasons that the Gittingses' responses to his petition are like claims initiated against an estate, and the limitation periods applicable to those claims have expired.

The Gittingses argue that their responses are not procedurally barred. Without addressing nonclaim statutes, they maintain that (1) statutes of limitations do not apply to defenses, and (2) fraudulent concealment tolled the limitation periods, making their counterclaims timely.

We therefore must address this question: To what extent may statutes of limitations preclude the Gittingses' responses to William's petition?

As "practical and pragmatic devices" crafted by the legislature, statutes of limitations encourage prompt presentation of claims and spare the courts from litigation of stale claims. *Havens v. Ritchey*, 582 N.E.2d 792, 794

(Ind. 1991) (quoting *Rohrabaugh v. Wagoner*, 274 Ind. 661, 663–64, 413 N.E.2d 891, 893 (1980)). Observing these purposes, this Court long ago announced that statutes of limitations bar actions but not defenses—with the caveat that this rule applies only to "pure defenses," not to "matters which may be relied upon as forming a foundation for a counter-claim or cross complaint." *Robinson v. Glass*, 94 Ind. 211, 216 (1884). In other words, whether a statute of limitations applies to a claim depends on the claim's **function** as an action or as a defense, not on the claimant's **label** of the claim as one or the other. *Id.*; *see Chauffeurs, Local Union No. 135 v. Jefferson Trucking Co.*, 628 F.2d 1023, 1027 (7th Cir. 1980).

To identify how a claim functions, we look to the facts alleged and the relief sought. *See Good v. Clinton Circuit Court*, 503 N.E.2d 1218, 1220 (Ind. 1987). A claim is a "pure defense"—to which statutes of limitations do not apply—when it contests the opposing party's claim; but if a claim is a basis for affirmative relief, then it "form[s] a foundation for a counter-claim or cross complaint," and is thus subject to statutes of limitations. *Robinson*, 94 Ind. at 216; *see Ind. Dept. of State Revenue v. Estate of Daugherty*, 938 N.E.2d 315, 320 (Ind. T.C. 2010), *review denied*; *Chauffeurs*, 628 F.2d at 1027. *Compare Defense*, Black's Law Dictionary 509 (10th ed. 2014), *with Counterclaim*, Black's Law Dictionary 427 (10th ed. 2014).

So asserted "defenses" may actually be counterclaims and vice-versa; or the allegations can have "a dual character, being adapted both to offensive and defensive warfare." *C. Aultman & Co. v. Forgy*, 10 Ind. App. 397, 400, 36 N.E. 939, 940 (1894). When they have that dual character, Indiana Trial Rule 13(J) governs:

> The statute of limitations, a nonclaim statute or other discharge at law shall not bar a claim asserted as a counterclaim to the extent that:
> (1) it diminishes or defeats the opposing party's claim if it arises out of the transaction or occurrence that is the subject-matter of the opposing party's claim . . . .

This rule recognizes that statutes of limitations may preclude offensive claims—that is, claims seeking affirmative relief—but they do not

preclude defensive claims that arise out of the same transaction or occurrence as the opposing party's claim. *See Daugherty*, 938 N.E.2d at 320; *Crivaro v. Rader*, 469 N.E.2d 1184, 1187 (Ind. Ct. App. 1984), *trans. denied*.

For the Gittingses, this means that statutes of limitations may bar their "affirmative defenses" and counterclaims to the extent they seek affirmative relief, but not to the extent they contest William's claim that he is entitled to affirmative relief.

With these standards in hand, we next address whether fraudulent concealment makes the Gittingses' claims for affirmative relief timely.

## II. Fraudulent concealment did not toll the statutes of limitations.

The Gittingses asserted causes of action based on alleged acts and omissions that resulted in the Gittingses losing their interests in property that William received from the GLR Primary Trust.

The trial court agreed with William that the Gittingses' claims are statutorily time barred by statutes of limitations and nonclaim statutes—in part because fraudulent concealment did not toll the statutes of limitations.

The Gittingses argue only that the trial court erred in concluding that fraudulent concealment did not toll the limitation periods. They maintain that the statutes of limitations do not bar their causes of action because William fraudulently concealed those claims until 2011, when Brenda discovered that William was profiting from the property that had once been part of the NDR Primary Trust estate.

William responds that the trial court properly found no fraudulent concealment and correctly concluded that the Gittingses' asserted causes of action are untimely because they accrued on July 14, 1997, at the latest. We agree.

A cause of action accrues, and thus the limitations period begins to run, when the claimant "knew or, in the exercise of ordinary diligence, could

have discovered that an injury had been sustained as a result of the tortious act of another." *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992). Consistent with this rule, Indiana's tolling statute provides that the limitations period does not run while a person liable to an action conceals the cause of action from the party entitled to bring it. *See* Ind. Code § 34-11-5-1 (2018).

"[W]hen a cause of action accrues is generally a question of law." *Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009). But it can involve questions of fact, including whether fraudulent concealment prevented a party from discovering a cause of action, triggering tolling. *See Lyons v. Richmond Cmty. Sch. Corp.*, 19 N.E.3d 254, 262 (Ind. 2014); *Hughes v. Glaese*, 659 N.E.2d 516, 521–22 (Ind. 1995).

Here, the trial court found that the Gittingses' causes of action were not concealed until 2011 as the Gittingses allege. More specifically, the court found that by July 14, 1997, Brenda had copies of both trust agreements, with the GLR amendments, and knew the following:

- The land and mineral interests had been transferred from NDR Trust A to the GLR Primary Trust;
- Brenda and Marc had been removed as beneficiaries of the GLR Primary Trust;
- The GLR Primary Trust's sole beneficiary was William;
- Because the property had been transferred from NDR Trust A to the GLR Primary Trust, there was nothing left in the NDR Primary Trust after NDR Trust B was distributed to Brenda, William, and the grandchildren; and
- Under the terms of the GLR Trust Agreement, Brenda was excluded from receiving any more property.

The court also found that William's statement at the family gathering in the fall of 1997—that there was nothing left after Georgia's end-of-life expenses—was not fraudulent concealment and was accurate as to both NDR Trust A and NDR Trust B after its distribution.

We hold that these findings are not clearly erroneous and affirm the trial court's decision that fraudulent concealment did not toll the Gittingses' claims to make them timely.

The party alleging fraudulent concealment bears the burden to prove that tolling applies. *Alldredge v. Good Samaritan Home, Inc.*, 9 N.E.3d 1257, 1262 (Ind. 2014). This burden requires showing that the cause of action was concealed from the claimant until a certain time. *See id.*; *Guy v. Schuldt*, 236 Ind. 101, 108–09, 138 N.E.2d 891, 895–96 (1956). It also requires showing that either (1) the alleged wrongdoer actively concealed the cause of action and the claimant exercised due diligence to discover the cause of action, or (2) the parties' relationship—such as a fiduciary relationship—imposed on the alleged wrongdoer a duty to disclose the cause of action to the claimant. *Alldredge*, 9 N.E.3d at 1262; *Malachowski v. Bank One, Indianapolis*, 590 N.E.2d 559, 563 (Ind. 1992); *Hinds v. McNair*, 235 Ind. 34, 45, 129 N.E.2d 553, 560–61 (1955).

Here, we need not determine whether the Gittingses carried their burden to show that William and Brenda remained in a fiduciary relationship after NDR Trust B closed. That is because both forms of fraudulent concealment—active and failure-to-disclose—exist only if the cause of action is concealed from the party entitled to bring it. *See Guy*, 236 Ind. at 108, 138 N.E.2d at 895. And by mid-July 1997, the Gittingses' causes of action were not concealed. Brenda had everything she needed—in the deeds, the trust agreements, and the final accounting—to know about not only Georgia's and William's alleged wrongdoing but also the injury that the Gittingses now claim they sustained as a result: the loss of Brenda's and Marc's interests in the property.

More specifically, Brenda had been informed that after part of the NDR Primary Trust was distributed to NDR Trust A, NDR Trust B "contain[ed] the rest and remainder of the Primary Trust." In her testimony, Brenda acknowledged that she had signed the deeds stating that the disputed property would be transferred from NDR Trust A to Georgia as trustee under the GLR Trust Agreement. By July 14, 1997, Brenda had copies of both the NDR Trust Agreement and the amended GLR Trust Agreement—agreements showing that the GLR Primary Trust was

separate from the NDR trusts and governed by different terms. The agreements also showed that Brenda and Marc were not beneficiaries of the GLR trust, since Georgia had removed Brenda and Marc as beneficiaries under the GLR Trust Agreement. Brenda also signed the final account and petition to settle and close trust for NDR Trust B, and she acknowledged that the final account indicated that there was nothing left in that trust after the outlined "final distribution" to Brenda, William, Marc, and the other grandchildren took place.

In other words, Brenda either signed or possessed documents showing that the disputed property would be transferred from NDR Trust A to the GLR Primary Trust and would thereafter no longer be treated as if it were in NDR Trust A—and because of that transfer and the amendment to the GLR Trust Agreement, Brenda and Marc would not receive any of that property. With this information exposed, William did not conceal the Gittingses' causes of action by failing to disclose more.

Nor did William actively conceal the Gittingses' causes of action with misinformation after NDR Trust B was closed. William's statement that there was nothing left to distribute after Georgia's end-of-life expenses was accurate as to the NDR trusts—the only trusts in which the Gittingses had any interest after Georgia amended the GLR Trust Agreement. William did not need to remind them that their "inheritance" did not include any property in the GLR Primary Trust; the amended GLR Trust Agreement revealed that information. As Brenda acknowledged in her testimony, "It was pretty clear what was written [in the amendment], what [Georgia] had done."

In sum, the evidence supports the trial court's findings, and those findings support the trial court's conclusion that fraudulent concealment did not toll the limitation periods beyond July 14, 1997—when Brenda received the amended GLR Trust Agreement. Because the Gittingses argue only fraudulent concealment as a basis for timeliness, we affirm the court's judgment against the Gittingses on their claims for affirmative relief.

But a final question remains: whether the Gittingses' defenses and counterclaims defeat or diminish William's petition for court approval of the property transfers.

## III. William is not entitled to court approval of the property transfers.

In his petition, William asked the court to approve the transfers of property from NDR Trust A to Georgia—as trustee of the GLR Primary Trust—as being within the terms of the NDR Trust Agreement and thus proper under Indiana law. He also asked the court to find that Brenda knew of and consented to the transfer.

The Gittingses first argue that William has the burden to establish his right to the relief he requests. We agree.

Although William filed a petition and not a complaint, neither the Trust Code nor our trial rules indicate that we should treat his petition differently than a complaint. *See* Ind. Code § 30-4-6-5 (2018); T.R. 3, 4, 41. The Trust Code provides that proceedings "may be initiated on either a petition or complaint and upon notice" to all persons known to claim an interest in the trust estate. I.C. § 30-4-6-5.[2] The general rule for complaints is that the party asserting the claim for relief bears the burden to move the litigation forward and to prove the asserted claim. *See* T.R. 41(B), (C), (E); *Petrovski v. Neiswinger*, 85 N.E.3d 922, 925 (Ind. Ct. App. 2017). Since the Trust Code and trial rules do not instruct otherwise, William bears this burden.

The Gittingses next argue that William failed to carry his burden because the following were improper: (1) Georgia's amendment to the

---

[2] The Trust Code also relies on the trial rules for the form and manner of service for the required notice. I.C. § 30-4-6-6(a)–(c). It specifically refers to service of summons, I.C. § 30-4-6-6(b), (c), which under the trial rules is prepared contemporaneously with the commencement of a civil action, T.R. 4(B), by the filing of "a complaint or such equivalent pleading or document," T.R. 3.

GLR Trust Agreement, removing Brenda and Marc as beneficiaries of the GLR trust; (2) Georgia's distribution of property from the NDR Primary Trust to NDR Trust A and NDR Trust B; and (3) the transfers of property from NDR Trust A to the GLR Primary Trust. Their reasons include that the NDR Trust Agreement and the GLR Trust Agreement were part of a mutual estate plan that created a single, implied trust, binding each settlor to the terms of the spouse's trust.

We agree with the trial court that the NDR Trust Agreement and the GLR Trust Agreement did not create a single, implied trust and that Georgia's amendment of the GLR Trust Agreement—removing Brenda and Marc as beneficiaries—did not violate the terms of either trust agreement. But based on our de novo review of the trust terms and Indiana statutes, we disagree with the trial court that the transfers of property from NDR Trust A to the GLR Primary Trust were proper. So William is not entitled to court approval. We address each of these matters in turn, starting with the amended GLR Trust Agreement.

## A. The trust agreements permitted Georgia to amend the GLR Trust Agreement to make William the sole beneficiary.

The NDR Trust Agreement and the GLR Trust Agreement did not include language incorporating the terms of the other. *See Care Group Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 754–55 (Ind. 2018) ("For incorporation to occur, the incorporating contract must include a clear and explicit expression of intent to be bound by the auxiliary content."). On the contrary, each trust agreement specified that "[t]his Trust Agreement contains the entire trust agreement between the parties hereto," without even referencing the spouse's comparable trust agreement. Although the NDR Trust Agreement's merger provision enabled consolidating the estate of one trust with the estate of another trust if certain conditions were met, that provision did not incorporate terms of another agreement. It instead required that the terms of the trusts with commingled estates be substantially the same, and it specified that the merging of the trust estates would not amend or revoke any terms of the trusts.

Nor did either agreement prohibit its settlor from amending or revoking his or her agreement after the settlor's spouse died. Rather, each agreement permitted the settlor to revoke or amend his or her agreement during the settlor's lifetime:

> [D]uring the life of the Settlor, the Settlor shall have the power to completely revoke or terminate this Trust Agreement, at any time, by an instrument signed by the Settlor and delivered to the Trustees during the life of the Settlor. In addition, during the life of the Settlor, the Settlor shall have the power to alter or amend this Trust Agreement, in whole or in part, at any time and from time to time, by an instrument signed by the Settlor, and delivered to the Trustees.

The Gittingses correctly note that the GLR Trust Agreement permits modification "only by a written agreement of the parties hereto." But the "parties hereto" could dwindle down to the settlor alone, under certain circumstances. Here's how: The "parties hereto" explicitly refers to "[t]he Settlor and the Trustees." The agreement identifies the "Trustees" as the settlor and the spouse. It also recognizes that if the spouse becomes unqualified during the settlor's life, "then the remaining Trustee shall be the sole Trustee" of the primary trust. And it indicates that Brenda and William would be co-trustees of Trust A and Trust B "[u]pon the death of the settlor." Under these provisions—regardless of whether new trustees to a trust become parties to the agreement at the settlor's death—the Settlor/Trustee becomes the **only** party to the agreement if and while the settlor survives the spouse.

That's what happened here. Nile died before Georgia, leaving Georgia as the settlor and sole trustee, and thus the only party to the GLR Trust Agreement, while she remained alive. So under the terms of the GLR Trust Agreement, Georgia could—and did—modify that agreement in writing and signed by her as Settlor and Trustee.

We now turn to the propriety of the property transfers.

## B. The property transfers from NDR Trust A to the GLR Primary Trust were improper, so William is not entitled to court approval of them.

The trial court concluded that the transfers of property from the NDR Primary Trust to NDR Trust A, and from NDR Trust A to Georgia as trustee of the GLR Primary Trust, were proper. On this basis, it granted William court approval of the transfers from NDR Trust A to the GLR Primary Trust.

We disagree with the trial court that the transfers from NDR Trust A to Georgia, as trustee under the GLR Trust Agreement, were proper. So William is not entitled to the court approval he requested. Three separate Trust Code sections in force when the transfers occurred in 1995 inform our analysis.

First, the Trust Code required that the transfers be authorized by a court because Georgia's interest as trustee of the GLR Primary Trust conflicted with her duty as trustee of NDR Trust A. Specifically, Indiana Code section 30-4-3-5 (1993) provided the following:

> (a) If the duty of the trustee in the exercise of any power conflicts with his individual interest or his interest as trustee of another trust, the power may be exercised only with court authorization.
>
> (b) For the purposes of subsection (a) of this section, the interest of an affiliate of the trustee will be deemed to be the interest of the trustee.

Here, there was a clear conflict of interest: Georgia could designate her son William as sole beneficiary of the GLR Primary Trust. But because she was not the settlor of the NDR Trust Agreement, Georgia could not remove Brenda and Marc as beneficiaries of NDR Trust B—the trust that would receive leftover assets from NDR Trust A after Georgia's death. Thus, Georgia's transfer of property from NDR Trust A to the GLR Primary Trust required court approval, which Georgia did not obtain.

William does correctly note that a 2006 amendment to the Trust Code provides an exception to the court-approval requirement. He argues that this provision should apply retroactively here.

Under the amendment, court approval is not required before a trustee exercises a power that conflicts with the trustee's individual interest if the terms of the trust "specifically authorized" the exercise of that power. P.L. 61-2006, § 7 (codified at Ind. Code § 30-4-3-5(a)(3) (2018)). William argues that the NDR Trust Agreement specifically authorized Georgia's actions as co-trustee of NDR Trust A. He reasons that the agreement permits the trustees to make principal distributions to Georgia for her support, maintenance, and health, and the agreement states that if any trustees disagree about the distribution of principal, "the decision of the Settlor's spouse shall, in all events, control."

Even if the amendment applies retroactively, the NDR Trust Agreement did not specifically authorize Georgia to make a distribution to herself without providing material information to the other co-trustees. Rather, the agreement gave Georgia overriding authority in distribution decisions only "[i]n the event there is any disagreement." Here, the record shows no disagreement among the trustees, so Georgia could not have exercised this authority in transferring the property from NDR Trust A to the GLR Primary Trust. Thus, whether or not the 2006 amendment applies retroactively, the transfers required court authorization.

Second, the Trust Code required that the transfers be fair and reasonable, with all material facts disclosed to beneficiaries:

> Unless the terms of the trust provide otherwise, the trustee may sell, exchange, or participate in the sale or exchange of trust property from one (1) trust to himself as trustee of another trust, provided the sale or exchange is fair and reasonable with respect to the beneficiaries of both trusts and the trustee discloses to the beneficiaries of both trusts all material facts related to the sale or exchange which the trustee knows or should know.

I.C. § 30-4-3-7(d) (1993).

It is undisputed that when Georgia asked Brenda to sign the deeds to transfer the property in 1995, Georgia did not provide Brenda with the GLR Trust Agreement, which contained material information about how the transfer would affect Brenda's and Marc's interests (or lack thereof) in the property. Thus, the transfer was improper for this separate reason.

Third, and finally, the Code stated that consent is not a defense to liability for breach of trust under certain circumstances:

> The consent, acquiescence, agreement to release or discharge, affirmance, or participation by a beneficiary will not relieve the trustee from liability if [one of the following conditions is met]:
> . . . .
> (2) at the time it was given the beneficiary did not know of his rights or all of the material facts which the trustee knew or should have known;
> (3) it was induced by the trustee's improper conduct;
> (4) the trustee had an adverse interest in the transaction and the transaction was not fair and reasonable;
> . . . .

I.C. § 30-4-3-19(b) (1993).

Here, the transfer was not defensible on grounds of consent: Georgia had an adverse interest in the transaction, and Brenda lacked material information about her rights when she signed the deeds.

In sum, the transfers of property from NDR Trust A to Georgia, as trustee of the GLR Primary Trust, required court authorization and took place without all material facts disclosed to Brenda, a trustee and beneficiary under the NDR Trust Agreement. William is therefore not entitled to a court order approving those transfers.

# Conclusion

Although the Gittingses' claims are subject to statutes of limitations to the extent they seek affirmative relief, the statutes do not prevent the Gittingses' claims from diminishing or defeating William's request for court approval of the property transfers. And because the transfers were improper, William is not entitled to court approval of them.

We therefore affirm in part, reverse in part, and remand to the trial court for proceedings consistent with this opinion.

David, Massa, Slaughter, and Goff, JJ., concur.

ATTORNEYS FOR APPELLANTS
James D. Johnson
Jackson Kelly PLLC
Evansville, Indiana

Matthew P. Heiskell
Spilman Thomas & Battle PLLC
Morgantown, West Virginia

ATTORNEYS FOR APPELLEE
David L. Jones
David E. Gray
Jones · Wallace, LLC
Evansville, Indiana

John G. Wetherill
Wetherill Law Office
Rockport, Indiana