

FILED

Mar 06 2020, 9:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

David L. Jones
David E. Gray
Craig R. Emig
Jones • Wallace, LLC
Evansville, Indiana

John G. Wetherill
Wetherill Law Office
Rockport, Indiana

Gerald R. Thom
Jasper, Indiana

ATTORNEY FOR APPELLEES

James D. Johnson
Jackson Kelly PLLC
Evansville, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

William H. Deal,

*Appellant-Petitioner,*

*v.*

Brenda Sue Gittings and Marc Richmond Gittings,

*Appellees-Respondents.*

March 6, 2020

Court of Appeals Case No.
19A-TR-2210

Appeal from the Spencer Circuit
Court

The Hon. Mark R. McConnell,
Special Judge

Trial Court Cause No.
74C01-1305-TR-27

**Bradford, Chief Judge.**

# Case Summary

[1] Nile and Georgia Richmond were married in 1985. Nile's daughter from a previous marriage is Brenda Gittings, and Georgia's son from a previous marriage is William Deal. While alive, Nile and Georgia executed a series of trusts that, *inter alia*, provided that upon their deaths, interests in certain real estate acquired by Nile during his life would be divided, with one-third going to Brenda, one-third going to William, and the remining one-third divided equally between Nile and Georgia's grandchildren.

[2] Nile passed in 1995, and the assets from his *inter vivos* trust passed into another trust, of which Brenda, William, and Georgia were co-trustees. Soon after Nile's passing, Georgia reformed her trust agreements and transferred title to the real estate ("the Transfers") such that Brenda and the grandchildren were no longer to receive any interest in it upon her death, which occurred in 1997. The Transfers were made without court approval and without disclosing all of the material facts to Brenda.

[3] In around 2010, after the real estate began producing significant amounts of income through coal and gas leases, Brenda began asserting an interest in it. In 2013, William petitioned the trial court to approve the Transfers. After a bench trial, the trial court approved the Transfers, but, in 2018, the Indiana Supreme Court held that William was not, in fact, entitled to court approval of them and remanded the matter to the trial court for further proceedings. In September of 2019, the trial court declared the Transfers void *ab initio* and ordered a constructive trust to facilitate the transfer of the real estate and income received

since the Transfers to Brenda and the other original beneficiaries. William appeals, arguing that the trial court clearly erred in declaring the Transfers void *ab initio* and in ordering the creation of a constructive trust. Because we disagree, we affirm.

# Facts and Procedural History

[4] Nile was originally from West Virginia and, during his lifetime, acquired hundreds of acres of real estate and mineral interests in that state. (Appellee's App. Vol. II p. 10). Further underlying facts of this case were related as follows by the Indiana Supreme Court:

> Nile and Georgia Richmond married in 1985. They had no children together, but each had a child from a previous marriage: Brenda Sue Gittings (Nile's daughter) and William Deal (Georgia's son).
>
> ### A. The trust agreements.
>
> As part of their estate planning, Nile and Georgia executed two trust agreements, each identified by the settlor's name: the Nile D. Richmond Primary Trust Agreement ("NDR Trust Agreement"), with Nile as settlor; and the Georgia L. Richmond Primary Trust Agreement ("GLR Trust Agreement"), with Georgia as settlor. Each settlor, while alive, could modify his or her respective agreement, but when Nile and Georgia executed the agreements, the terms mirrored one another.
>
> Each agreement set up a Primary Trust, a Trust A, and a Trust B. The NDR Trust Agreement thus established the NDR Primary Trust, NDR Trust A, and NDR Trust B. And the GLR Trust Agreement similarly established the GLR Primary Trust, GLR Trust A, and GLR Trust B. After executing the trust agreements, Nile and Georgia funded each primary trust with, among other assets, undivided one-half interests in land and minerals they owned in West Virginia and Indiana.

The primary trusts were inter vivos trusts, holding Nile's and Georgia's primary trust estates during each of their lives. Once the settlor died, the assets of that primary trust estate would be distributed to the respective Trust A and/or Trust B.

The initial trustees were the settlor and the spouse. But if the settlor died first, the surviving spouse would not be the sole trustee of Trust A and Trust B. The trust agreements made this explicit: "In no event shall the surviving spouse serve as sole Trustee after the death of [the] Settlor." Instead, after the settlor's death, the surviving spouse, "along with William H. Deal and Brenda Sue Gittings, shall serve as Co-Trustees of Trust A and Trust B."

Trust A—a marital-deduction trust with provisions removing certain discretion from the surviving spouse—was designed to provide for the surviving spouse's support, maintenance, and health. It was to receive no less than the smaller of $100,000 or the balance of the settlor's primary trust. Once the surviving spouse died, assets remaining in Trust A would go into Trust B.

Apart from receiving any Trust A leftovers, Trust B was set up to receive two other classes of assets: those transferred directly to Trust B by the decedent settlor's last will, and those remaining in the settlor's primary trust estate after its distribution to Trust A.

Trust B would be distributed after both the settlor's and the spouse's deaths. Each trust agreement originally instructed that the assets collected in its Trust B be distributed in thirds: one third to Brenda, one third to William, and one third divided equally among Nile's and Georgia's grandchildren.

### B. The amended agreement and the property transfers.

Nile died in January 1995, leaving Georgia as the surviving spouse and co-trustee—with Brenda and William—of NDR Trust A and NDR Trust B.

About six months later, Brenda gave birth to her son, Marc. Concerned about whether Marc—having been born after Nile's death—was part of the beneficiary class of grandchildren, Brenda

asked Georgia for a copy of "the trust."  At this point, although Brenda's understanding was that Nile and Georgia had each created a separate trust, she didn't know details about their terms; she had neither received a copy of the NDR Trust Agreement from Nile nor seen a copy of the GLR Trust Agreement.  Based on what her father told her, Brenda thought that "[a]fter [Nile's] death whatever was in his trust would go into Georgia's for safekeeping."

Soon after Brenda requested "the trust," Georgia distributed the NDR Primary Trust estate to NDR Trust A and NDR Trust B, and amended the GLR Trust Agreement, removing Brenda and Marc as beneficiaries.

Georgia next sent Brenda a copy of the NDR Trust Agreement along with four deeds, a lease assignment, and a note asking Brenda to sign and return the deeds and assignment.  The deeds and assignment referenced the GLR Trust Agreement and purported to convey the one-half interests in West Virginia and Indiana property from NDR Trust A to "Georgia L. Richmond, as Trustee … under a Trust Agreement … known as the [GLR Trust Agreement]."  Georgia did not, however, send Brenda a copy of the GLR Trust Agreement, original or amended.

Seeking advice, Brenda turned to legal counsel at the office where she worked as a paralegal.  Brenda's counsel sent a letter to Georgia's attorney, explaining that Brenda sought to determine "her status under her father's Will and his Primary Trust Agreement," and acknowledging that Brenda had received a copy of "the Trust Agreement" from Georgia.  In the letter, Brenda's counsel also asked Georgia's attorney for documents "bearing materially upon Brenda's interest as trustee or beneficiary."

Georgia's attorney responded with documents related to the NDR trust assets.  He listed the assets in NDR Trust A, explained that "[NDR] Trust B contains the rest and remainder of the Primary Trust," and set out the assets in Trust B.  But he

did not include the GLR Trust Agreement, believing that he was not authorized to disclose Georgia's information to a third party.

Although neither Brenda nor her counsel had seen the GLR Trust Agreement that the deeds and assignment referenced, Brenda signed the deeds and assignment, and her attorney sent them to Georgia's counsel. Georgia and William signed similar deeds—not the same documents that Brenda signed, but ones that likewise purported to transfer the West Virginia and Indiana property from NDR Trust A to Georgia as trustee under the GLR Trust Agreement.

Georgia died in March 1997. Her death triggered distribution of the NDR trust estate through NDR Trust B—in thirds to Brenda, William, and the grandchildren, including Marc. In June 1997, Brenda signed the final account and petition to settle and close NDR Trust B. This document showed that the trust estate would be completely depleted upon the "final distribution" of the "balance in trust" to Brenda, William, Marc, and the other grandchildren. Under that distribution—outlined in the accounting—Brenda and William each received almost $91,000 and each grandchild received approximately $22,710 placed in individual trusts.

Not long after Brenda signed the final account, an attorney who helped administer NDR Trust B and who handled the administration of Georgia's estate sent Brenda a copy of the amended GLR Trust Agreement. When Brenda received it around July 14, 1997, she learned that she and Marc had been eliminated as beneficiaries and that everything in the GLR trust would go to William. As the GLR trust's sole beneficiary, William received the property that the deeds—both the ones that Brenda signed and the ones that William and Georgia signed— purported to transfer in 1995 from NDR Trust A to Georgia as trustee of the GLR Primary Trust.

After receiving the GLR Trust Agreement and learning that she and Marc were not beneficiaries, Brenda was "pretty downtrodden for quite a while." But she did not turn to her legal

counsel for advice about the GLR Trust Agreement and its amendments. Nor did she bring any claims at that time or object to the executor's final account and petition to settle Georgia's estate.

Sometime around that fall at a family gathering, Brenda's husband—with Brenda there—asked William about any more inheritance. William responded that there wasn't anything left after Georgia's medical, nursing home, and funeral bills had been paid.

About thirteen years later, in 2010, the property in West Virginia that William received from the GLR trust began producing significant income—hundreds of thousands of dollars annually— from oil and gas leases. Over the next couple of years, Brenda consulted with an attorney and sent William a letter, making claims on the property.

William found among his mother's things the deeds that Brenda signed in 1995 and, after consulting with his own attorney, recorded them in June 2012.

### C. Court proceedings.

In 2013, William petitioned the trial court to docket the NDR Trust Agreement and to grant him declaratory relief by approving the transfers of the land and mineral interests from NDR Trust A to Georgia as trustee under the GLR Trust Agreement. He also asked the court to find that Brenda knew about and consented to the transfers, and—based on that consent and the statutes of limitations—to preclude Brenda from bringing claims for breach of trust and for recovery of real estate.

The court allowed Marc Gittings (Brenda's son) to intervene, and the Gittingses responded to William's petition with defenses and counterclaims. They alleged in part that the property transfers violated the terms of the NDR Trust Agreement, making the transfers void or voidable, and that Brenda's actions did not validate the transfers because Georgia and William transferred the property without giving Brenda all material information. They also asked the court to—among other things—deny

William court approval of the transfers, void the transfers, and award the Gittingses compensation for acts that led to William's sole receipt of the property.

After a bench trial,[1] the court issued findings of fact and conclusions of law and entered judgment in William's favor. It determined that the property transfers were proper under the terms of the NDR Trust Agreement and under Indiana law. It also concluded that the Gittingses' counterclaims were time barred. The Gittingses appealed.

A panel of the Court of Appeals affirmed judgment for William, concluding that the statutes of limitations bar the Gittingses' claims. *Gittings v. Deal*, 84 N.E.3d 749, 761 (Ind. Ct. App. 2017). Although the panel found the statutes-of-limitations issue dispositive, it nonetheless addressed the validity of the property transfers, out of concern about the trustees' conduct. *Id.* at 758. In doing so, it concluded that the transfers were improper under the NDR Trust Agreement and the Trust Code. *Id.* at 759–61.

The Gittingses petitioned to transfer. After hearing oral argument, we granted transfer—vacating the Court of Appeals decision, Ind. Appellate Rule 58(A)—and referred the case to mediation, App. R. 20. The parties participated in mediation but did not reach an agreement.

*Gittings v. Deal*, 109 N.E.3d 963, 967–70 (Ind. 2018) (footnote omitted).

[5]     The Indiana Supreme Court ultimately concluded that (1) the Gittingses' claims were barred by the relevant statute of limitations to the extent that they sought affirmative relief but not to the extent that they sought to defeat or diminish William's claim to declaratory judgment, (2) fraudulent concealment did not

---

[1] During the trial, which was held between August 31 and September 2, 2015, William testified that he had received more than $3,000,000.00 in royalties, bonuses, and rents related to the West Virginia holdings.

render the Gittingses' claims for affirmative relief timely, and (3) William was not entitled to court approval of the transfers of the land and mineral interests from NDR Trust A to Georgia as trustee under the GLR Trust Agreement ("the Transfers"). *Id*. at 971. The Court determined that William was not entitled to court approval of the Transfers because Georgia did not seek court approval despite a clear conflict of interest, Georgia failed to provide all material facts regarding the Transfers to Brenda, and Brenda's consent (even if it occurred) was no defense to liability for breach of trust in this case. *Id*. at 976–77. The Indiana Supreme Court affirmed the trial court in part, reversed in part, and remanded for further proceedings consistent with its opinion. *Id*. at 978.

[6] On September 13, 2019, the trial court issued its order on remand, which provides, in full, as follows:

> This matter was remanded to the trial court for proceedings consistent with the opinion rendered by the Indiana Supreme Court in Cause No. 18S-TR-231.
>
> This Court therefore declares that any transfer of real estate or any interests therein made by any trustee or co-trustee of the [NDR] Trust A to Georgia L. Richmond as trustee of the [GLR] Primary Trust is void ab initio.
>
> It is further ordered that William H. Deal shall cause a copy of this order to be recorded in the Office of the Recorder in any county in Indiana and West Virginia in which any record of the transfer of real estate or rights therein by any trustee or co-trustee of the [NDR] Trust A to Georgia L. Richmond as trustee of the [GLR] Primary Trust exists.
>
> The Court further declares that the portion of such real estate that should have been conveyed to Brenda Sue Gittings and Marc Richmond Gittings and any income generated from said real

estate is deemed to have been held in constructive trust on behalf of said beneficiaries by Georgia L. Richmond or William H. Deal.

It is further ordered that William H. Deal is enjoined from directly or indirectly, disposing, encumbering or otherwise engaging in any transaction concerning the assets of the [NDR] Trust A or Trust B except as expressly provided under the terms of said Trusts.

It is further ordered that William H. Deal provide an accounting, within ninety (90) days of the date of this order, of all property held in trust on behalf of the [NDR] Trust A and the [NDR] Trust B including the real estate referenced above and any rights to future payment related thereto, as well as any income generated from the assets from the time of the transfer until the present.

It is further ordered that the property held in the [NDR] Trust A and the [NDR] Trust B be distributed per the terms of the Trusts as called for in the event of Georgia L. Richmond's death, so as to restore Brenda Sue Gittings and Marc Richmond Gittings to the status quo, had no transfer occurred.

Appellant's App. Vol. II pp. 24–25.

# Discussion and Decision

Pursuant to the Indiana Uniform Declaratory Judgment Act (the "Act"), declaratory judgments have the "force and effect of a final judgment," Ind. Code § 34-14-1-1, and are therefore reviewed in the same manner as other judgments. Because the proceedings before the trial court on remand in this case consisted of briefings, a *de novo* standard of review applies. *See Title Servs., LLC v. Womacks*, 848 N.E.2d 1151, 1154 (Ind. Ct. App. 2006) (applying *de novo* standard of review where trial court ruled based on a paper record). In applying the standard, the trial court's order should be affirmed on any legal theory the

evidence of record supports. *See GKN Co. v. Magness*, 744 N.E.2d 397, 401 (Ind. 2001).

[8] The Act is remedial, and its purpose is to "settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and is to be liberally construed and administered." Ind. Code § 34-14-1-12. Pursuant to Indiana Code section 34-14-1-14, a trial court may make declarations of rights or legal relations

> (1) to ascertain any class of creditors, devisee, legatees, heirs, next of kin, or others;
>
> (2) *to direct the executors, administrators, or trustees to do or abstain from doing any particular act in their fiduciary capacity*; or
>
> (3) to determine any question arising in the administration of the estate or trust, including questions of construction of wills and other writings.

(Emphasis added). Declaratory relief should furnish an adequate and complete remedy, effectively solve the problem involved, and provide a resolution that will cause a just and more expeditious and economical determination of the entire controversy. *Ferrell v. Dunescape Beach Club Condos. Phase I, Inc.*, 751 N.E.2d 702, 708 (Ind. Ct. App. 2001) (internal citations omitted). William appeals, arguing, as restated, that the trial court erred in granting the Gittingses affirmative relief and in declaring the Transfers to be void *ab initio*.

## I. Whether the Trial Court Improperly Granted the Gittingses Affirmative Relief

[9] William contends that the trial court improperly granted the Gittingses affirmative relief to which they were not entitled because claims for affirmative

relief were time-barred. Although we acknowledge that the Indiana Supreme Court's decision prevented the Gittingses from obtaining affirmative relief on remand, this is not what occurred. "A claim is a 'pure defense'—to which statutes of limitations do not apply—when it contests the opposing party's claim; but if a claim is a basis for affirmative relief, then it 'form[s] a foundation for a counterclaim or cross complaint,' and is thus subject to statutes of limitations." *Gittings*, 109 N.E.3d at 971 (quoting *Robinson v. Glass*, 94 Ind. 211, 216 (1884)).

[10] In William's petition to docket the NDR Primary Trust, he sought to have the Transfers approved by the court. The Gittingses countered William's petition with their claim that the Transfers were contrary to law and therefore void. This is not a new claim for affirmative relief but a response in opposition to William's, denying its merits. The fact that the trial court adopted the Gittingses' counter-argument does not mean that it granted the Gittingses affirmative relief.[2]

## II. Whether the Trial Court Properly Ordered Equitable Relief to the Gittingses

[11] William also argues that the trial court was without authority to declare the Transfers void *ab initio* or create a constructive trust. Given the Indiana Supreme Court's holding that William was not entitled to court approval of the

---

[2] The Gittingses did seek some affirmative relief in the trial court, making such counter-claims as tortious interference with expectancy interest and conversion. The Gittingses no longer pursue these claims, however, conceding that they are time-barred.

transfers, and in light of a probate court's equitable powers, we must again disagree.

> In Indiana, probate courts possess general equity powers. *Powell v. North* (1859), 3 Ind. 392. Those powers include the authority to supervise and control the administration of trusts. *See State ex rel. Anderson-Madison County Hospital Development Corp. v. Superior Court of Madison County* (1964), 245 Ind. 371, 199 N.E.2d 88; *Messner v. DeMotte* (1948), 119 Ind. App. 273, 82 N.E.2d 900, *trans. denied; Hulet v. Crawfordsville Trust Co.* (1946), 117 Ind. App. 125, 69 N.E.2d 823; *Newlin v. Newlin* (1944), 114 Ind. App. 574, 52 N.E.2d 503, *trans. denied.* The Indiana Trust Code does not pretend to limit the equity power of probate courts except as it specifically provides. *See* IND. CODE 30-4-3-30.[3]

*Matter of Trust of Loeb*, 492 N.E.2d 40, 43 (Ind. Ct. App. 1986), *trans. denied*.

[12]  William points to no provision in the Indiana Trust Code—either as it existed in 1995 when the Transfers occurred or in its current form—that would prevent the trial court from using its equitable powers to declare unauthorized property transfers void, and we are aware of none. Consequently, we review the trial court's disposition for clear error:

> When reviewing cases of equity, the trial court's findings and judgment will be reversed only if clearly erroneous, that is, only if we are left with a definite and firm conviction that a mistake has been made. *Burnett v. Heckelman*, 456 N.E.2d 1094, 1097 (Ind. Ct. App. 1983). We look only to the evidence and inferences therefrom supporting the judgment, neither reweighing the evidence nor judging the credibility of witnesses, and will reverse

---

[3]  Indiana Code section 30-4-3-30 provides that "[e]xcept as otherwise provided in this article, the article shall not be construed to limit the general equity powers of the court over the administration of trusts."

only where the evidence leads to a conclusion directly opposite to that reached by the trial court. *Indiana High School Athletic Ass'n, Inc. v. Schafer*, 598 N.E.2d 540, 557 ([Ind. Ct. App.] 1992), *trans. denied*.

*Ind. Lawrence Bank v. PSB Credit Servs., Inc.*, 706 N.E.2d 570, 572 (Ind. Ct. App. 1999), *trans. denied*. "[T]he very first maxim with which we meet in equity is that it will regard that as done which in good conscience ought to be done." *Sourwine v. Supreme Lodge Knights of Pythias of the World*, 12 Ind. App. 447, 452, 40 N.E. 646, 647 (1895) (citation omitted).

[13] The equities of his case, briefly stated, are that the Transfers occurred without the required court approval despite a clear conflict of interest and without disclosure to Brenda of all the material facts. As a result of the illegal Transfers, the Gittingses, along with any other beneficiaries, have been denied hundreds of thousands of dollars to which they were entitled, while William has received hundreds of thousands of dollars to which he was not. Against this backdrop, we address separately whether the trial court committed clear error in declaring the Transfers void *ab initio* and in ordering the real estate and payments that should have gone to the Gittingses to be held in a constructive trust.

## A. Voiding the Transfers

[14] William argues that the Transfers were, at most, voidable and that the trial court's determination that they were void *ab initio* was clearly erroneous. If anything, however, the Supreme Court's disposition and relevant statutory language would seem to allow for no other result. In 1995, Indiana Code section 35-4-3-5(a) provided that "[i]f the duty of the trustee in the exercise of

any power conflicts with his individual interest or his interest as trustee of another trust, *the power may be exercised only with court authorization*." (Emphasis added).  While the statute most likely contemplates situations in which permission is sought before the exercise of power, its language is not limited to those circumstances.  Indiana Code section 35-4-3-5's plain language indicates that the Transfers could only have taken place with court authorization, which did not occur then and will not occur now.  While we are not entirely certain that the trial court could have reached any other result, we can say, at the very least, that its declaration that the Transfers were void *ab initio* was not clearly erroneous.

[15]  It is worth noting that this result is consistent with how self-dealing is treated in the similar context of property transfers by an estate's personal representative.  In that context, there is long-standing authority indicating that self-dealing transfers by a personal representative are void *ab initio*, as opposed to merely voidable.  *See, e.g.*, *Williamson v. Williamson*, 714 N.E.2d 1270, 1273 (Ind. Ct. App. 1999) ("In some jurisdictions purchases of estate assets by personal representatives at their own sales are merely voidable.  However in this jurisdiction, in the absence of a family settlement or agreement, such purchases are void."), *trans. denied*.  The justification for this rule was stated by the Indiana Supreme Court in *Matter of Garwood's Estate*, 272 Ind. 519, 400 N.E.2d 758, (1980):

> "It matters not that there was no fraud contemplated and no injury done.  The rule is not intended to be remedial of actual wrong, but preventive of the possibility of it.  It is one of those

processes derived from the system of trusts by which a court of chancery turns parties away from wrong, and from the power of doing wrong, by making their act instantly inure in equity to rightful purposes. The cases are uniform in declaring that it matters not how innocent and *bona fide* and free from suggestion of fault the transaction may be, nor how harmless or even beneficial the interference of the trustee may have been, the trustee can never, by his own act, shake off the equity of the *cestui que trust*[4] to have the benefit of all that he does in the scope of the trust; and the *cestui que trust* may come into equity as of course; and, without the imputation of either fraud or injury, ask for a re-sale of the property; and whether the property was or was not worth more than the amount of the trustee's bid, is never inquired into."

*Id.* at 528, 400 N.E.2d at 764 (quoting *Potter v. Smith*, 36 Ind. 239–40 (1871)).

[16] In this case, just as in cases like *Williamson* and *Garwood's Estate*, a trustee has control over property that is to be used for the benefit of another, creating obvious opportunities for mischief. Consequently, we find that the goal of preventing the possibility of fraud to be equally compelling in either case. We conclude that the trial court did not clearly err in declaring the Transfers to be void *ab initio*.

## B. Constructive Trust

[17] William also challenges the trial court's order that a constructive trust be established. A constructive trust is more in the nature of a an equitable remedy than an independent cause of action, *Zoeller v. E. Chicago 2d Century, Inc.*, 904

---

4 The "cestui que trust" is an alternate name for the beneficiary of a trust, literally meaning "the one for whom [is] the trust[.]" BLACK'S LAW DICTIONARY 277 (10th ed. 2014) (second set of brackets supplied).

N.E.2d 213, 221 (Ind. 2009), and "may be imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he or she would be unjustly enriched if permitted to retain it." *Demming v. Underwood*, 943 N.E.2d 878, 895 (Ind. Ct. App. 2011), *trans. denied*. As the Indiana Supreme Court has stated,

> [a] constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may rise because it was acquired through fraud, duress, undue influence or mistake, or through a breach of a fiduciary duty, or through the wrongful disposition of another's property. The basis of the constructive trust is the unjust enrichment which would result if the person having the property were permitted to retain it.

*Melloh v. Gladis*, 261 Ind. 647, 656, 309 N.E.2d 433, 438–39 (1974) (citation omitted).

[18] We have little trouble concluding that constructive trust is appropriate in this case, given that the Transfers out of the NDR Trust A were illegal and the Gittingses have been denied hundreds of thousands of dollars in income thereby. William has legal title in trust property that he must now convey to beneficiaries, and if William retained possession of the trust property, he might be further unjustly enriched, the beneficiaries further damaged, or both. Contrary to William's argument, a constructive trust is not affirmative relief granted to the Gittingses; it is a remedy to ensure that trust property is appropriately conveyed pursuant to the terms of the trust agreement. *See Zoeller*, 904 N.E.2d at 221.

The judgment of the trial court is affirmed.

Robb, J., and Altice, J., concur.