

IN THE

# Court of Appeals of Indiana

Anonymous Child I and Anonymous Child I's Mother,

*Appellants*

v.

Anonymous Physician, Anonymous Healthcare Group and Anonymous PC,

*Appellees*



FILED

May 15 2025, 9:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

May 15, 2025

Court of Appeals Case No.
24A-CT-1874

Appeal from the Marion Superior Court

The Honorable Timothy Oakes, Judge

Trial Court Cause No.
49D02-2207-CT-23247

**Opinion by Judge Brown**
Chief Judge Altice and Judge Tavitas concur.

**Judge, Brown**

[1] Anonymous Physician ("Physician") used his own sperm to inseminate the mother of Anonymous Child I without her consent. Child filed a medical malpractice lawsuit against Physician and Anonymous Healthcare Group ("Healthcare Group," and together with Physician, "Defendants"). The trial court entered summary judgment in favor of Defendants based on the medical malpractice statute of limitations. We reverse and remand.[1]

## Facts and Procedural History

[2] Child was born in 1985. On May 26, 2022, Child filed a Proposed Complaint for Damages with the Indiana Department of Insurance ("IDOI"). On July 12, 2022, Child filed an Anonymous Complaint for Damages against Defendants alleging that Physician used his own sperm to inseminate Child's mother without consent. The complaint alleged counts of: negligence; negligent infliction of emotional distress; negligent hiring, retention, and training as to Healthcare Group; and breach of contract. According to the chronological case summary ("CCS"), Child filed a First Amended Complaint on July 27, 2022,

---

[1] We held oral argument on April 16, 2025. We thank counsel for their well-prepared written and oral advocacy.

and a Second Amended Complaint on January 31, 2023, naming Child's mother as a plaintiff (Child and her mother together, "Plaintiffs").[2]

[3] On March 18, 2024, Defendants filed a motion for summary judgment arguing that the two-year medical malpractice statute of limitations applicable to Child's claims had expired. Defendants argued that Child, in her deposition, "confirmed that prior to the birth of her own daughter in 2019, she was aware of [Physician's] role as her parents' fertility doctor and was aware that [Physician] had allegedly used his own sperm to impregnate patients,"[3] and thus that "the statute of limitations for [Child's] claims should have commenced no later than the end of 2021." Appellant's Appendix Volume II at 39-40.

---

[2] The appellant's appendices include a "Second Amended Proposed Complaint for Damages" filed with the IDOI on January 23, 2023, naming Child's mother as a plaintiff and Anonymous PC as a defendant. Appellant's Appendix Volume II at 61. It alleged that, at all relevant times, Physician was acting within the course and scope of his employment, agency, and/or apparent agency for Healthcare Group and Anonymous PC. In addition to the counts raised in the initial complaint, the second amended proposed complaint included counts for "Breach of Warranty," "Fraud and Constructive Fraud," and "Battery." *Id.* at 76-83.

[3] Defendants pointed to the following portion of Child's deposition testimony:

> Q:    Was your daughter born when you first learned that [Physician] was your parents' fertility doctor and that [Physician] had allegedly used his own sperm to impregnate patients?
>
> A:    No.
>
> [Counsel for Child]: I'm just going to object to the form only to the fact that it misstates her earlier testimony that she didn't know about it being his own sperm, that she thought he was swapping donor sperm.
>
> Q:    And was she born in – was your daughter born in 2019?
>
> A:    Yes.

Appellant's Appendix Volume II at 88.

[4]     Child filed a response[4] arguing that she "does not recall the exact time she learned [Physician] had inseminated patients with his own sperm, but roughly placed the time she learned at some point between becoming a nurse practitioner in 2014 and giving birth in 2019." *Id*. at 90-91. Child stated:

> During this time [she] only had knowledge [Physician] had utilized his own sperm to impregnate patients by swapping *donor* sperm for his sperm. She never thought this situation applied to her because, based [on Physician's] assurances to [her] Mother, [she] and [her] Mother always understood that the intrauterine insemination had been done using [her] Mother's husband's sperm.

*Id*. at 91. Child stated that she "also thought the idea of her being a biological child of [Physician] was so farfetched given [she] looked so much like her father and her father's sister." *Id*. Child stated "[t]he initial news story regarding [Physician's] alleged conduct was broken by Fox 59 news reporter, Angela Ganote, in 2016" and, "[i]n this initial, breaking, story it was alleged that [Physician] himself told alleged biological children of his that he only used his own sperm whenever a *donor* was not available."[5] *Id*. at 91-92. Child stated:

---

[4] In a footnote, Child's response stated: "It is noted that Defendants' Motion is only brought as to [Child's] claims, not as to [Child's] Mother's Claims." Appellant's Appendix Volume II at 90 n.1.

[5] The article by Ganote in September 2016 stated in part:

> Court documents filed on Friday describe a meeting that took place in the spring of 2016 between [Physician] and six siblings. [Physician] described to the siblings that he used his own sperm whenever a donor sample wasn't available. And [he] admitted to wrongdoing by inseminating women with his own sperm.

After viewing the trailer for the documentary "Our Father," which was released on April 14, 2022, [she] decided to take a DNA test. Phillipe Thao, The 'Our Father' Trailer Uncovers a Former Fertility Doctor's Sickening Secret (April 14, 2022). Watching the documentary was the first time [she] learned that [Physician] had not just allegedly used his own sperm to artificially inseminate patients who believed they were using a donor, but that he *also* used his own sperm to artificially inseminate patients when such patients believed the partner-husband's sperm was being used. Given this new information she learned for the first time through watching the documentary, [she] took the DNA test . . . .

On May 6, 2022, [Child] received her DNA testing that showed [Physician] is her biological father. . . . Following [Child's] DNA test results, on May 26, 2022, within twenty days of receiving the test, [she] initiated claims against the Defendants.

*Id*. at 92-93 (citations omitted). Child argued that she "discovered her injury on May 6, 2022, when she received her DNA results which demonstrated she is a biological child of [Physician.]" *Id*. at 96. Child also argued her claims were tolled by the doctrine of fraudulent concealment.

[5] Defendants filed a reply arguing, "[a] reasonable person, aware that their fertility doctor was the subject of scandal involving the use of his own sperm,

---

In a conversation with Angela Ganote this summer, [Physician] said he didn't believe he was fathering children, rather helping families who were devastated by being unable to conceive on their own.

\* \* \* \* \*

In a recent letter to the attorney general, [Physician] denied using his own sperm for insemination, but admitted to some of these siblings that his sperm could have been used up to 50 times.

Appellant's Appendix Volume II at 227.

would seek to verify their parentage through readily available DNA testing" and "once there was public acknowledgment of [Physician's] practices, all patients, potential donors, or children conceived in his clinic had sufficient cause to investigate their parentage." *Id*. at 211.

[6] The trial court held a hearing on Defendants' motion for summary judgment. On July 22, 2024, the court granted Defendants' motion based on the medical malpractice statute of limitations. Child appeals.[6]

## Discussion

### A. *Arguments*

[7] Child argues that a jury should decide whether she acted with reasonable diligence. She argues "[t]here at least exists a question of fact as to whether reasonable diligence demanded that [she] order a DNA testing kit based on the initial allegations she learned of through media coverage—or, stated differently, whether she acted unreasonably in not ordering such a test in 2019." Appellant's Brief at 21. She maintains:

> [S]he possessed two highly significant pieces of information that led her to believe she *was not* affected: 1) that her parents informed her they used her father's sperm, and as she understood [Physician] only allegedly used his own sperm in circumstances where a third-party donor's was to be used; and 2) her belief that she could not

---

[6] The appellant's brief indicates it is submitted on behalf of Child. The appellees' brief indicates it is submitted on behalf of Physician and Healthcare Group. All parties of record in the trial court are parties on appeal. Ind. Appellate Rule 17(A). While it appears that Child's mother and Anonymous PC were parties of record in the trial court, they have not filed briefs on appeal.

possibly be a biological child of [Physician] given her physical resemblance to those on her father's side of the family.

*Id*. at 23. Child argues that Indiana Model Civil Jury Instruction 1559 "allows a *jury* to determine whether a claim was filed within an appropriate period of time[.]"[7] *Id*. at 29. She argues "[t]he personal invasion required to discover this injury further supports there is a question of fact as to what is 'reasonable'." *Id*. at 30. She also asserts that Physician's conduct constituted fraudulent concealment. She argues the court's order "rewards secretive, devious, and

---

[7] Child states that Model Civil Jury Instruction 1559 provides:

**1559 Statute of Limitations—General**

Indiana law generally provides that a plaintiff must file a claim of medical negligence within two years after a defendant commits medical negligence. There are few exceptions to this general rule, and [plaintiff] claims one of those exceptions in this case.

To decide whether [plaintiff] filed [his][her] claim within the required period of time, first, you must decide whether, and if so when, [defendant] committed the act of medical negligence.

Next, you must decide when a reasonable person would have discovered the act of medical negligence.

[If you decide that (plaintiff) discovered the medical negligence two years or more after the act of medical negligence, and that the time delay in discovering the negligence was reasonable, you must decide whether (plaintiff) filed this lawsuit within two years from the date (plaintiff) discovered the medical negligence. If so, (plaintiff) filed this lawsuit within the required time period.]

[If you decide that (plaintiff) should have discovered the medical negligence within two years of the act of medical negligence, you must decide whether it was reasonably possible for (plaintiff) to file this lawsuit within two years of the act of medical negligence or, if not, whether (plaintiff) filed it within a reasonable period of time. If so, (plaintiff) filed this lawsuit within the required time period.]

If you decide that [plaintiff] did not file this lawsuit within the required time period, you must decide in favor of [defendant].

Appellant's Brief at 28-29.

egregious conduct of a physician who deceived patients for decades in order to fulfill his own personal fantasies all while treating highly vulnerable, unassuming patients." *Id*. at 38.

[8] Defendants argue that Child learned, no later than December 31, 2019, that Physician used his own sperm to inseminate multiple patients without their consent. They assert that, "[o]nce [Child] became aware of the potential that [Physician] had used his own sperm to inseminate [Child's] mother, the only way to confirm her condition was through DNA testing." Appellees' Brief at 18. Defendants point to Child's deposition during which she testified: "How come we didn't think it could apply to us? No one wants to think about something that horrific applying to you. I think that's why I said it was outright denial, that it couldn't apply to us. It's too unfathomable." *Id*. at 19 (citing Appellant's Appendix Volume II at 206). They argue that Child's "reluctance to learn the truth about her condition does not toll the time limit to file her claim." *Id*. Defendants further argue that Child's "discovery of additional information in 2022 is immaterial; she had sufficient information by 2019 to instigate investigation of her condition." *Id*. at 22.

[9] The Indiana Trial Lawyers Association ("ITLA"), as Amicus Curiae, argues that "Indiana's courts have long recognized that questions about 'reasonable diligence' or 'reason to know' with regard to medical malpractice 'trigger dates' are fact-sensitive and best left to a jury." ITLA's Brief of Amicus Curiae at 11. It argues the "exercise of reasonable diligence" should not "require preemptively submitting one's DNA material to a for-profit testing company on

mere suspicion of medical malpractice, because such genetic tests are fraught with significant risks of their own." *Id*. at 14. It contends, "[g]iven the dangers, risks, and unreliability of commercial genetic testing services, the question of whether a 'reasonable person' would submit to such risks based on a mere 'suspicion' that malpractice had occurred is best left to a jury at trial, not a judge on a summary judgment motion." *Id*. at 16-17 (footnote omitted).

B. *Decision*

[10] "We review summary judgment de novo, applying the same standard as the trial court: Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014) (citations and quotations omitted). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (citation omitted). We carefully assess the trial court's decision to ensure the non-moving party was not improperly denied her day in court. *Id*.

[11] The parties agree that the medical malpractice statute of limitations governs Child's claims. Ind. Code § 34-18-7-1(b) provides:

> A claim, whether in contract or tort, may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided unless

the claim is filed within two (2) years after the date of the alleged act, omission, or neglect, except that a minor less than six (6) years of age has until the minor's eighth birthday to file.

[12] "This is an 'occurrence' statute as opposed to a 'discovery' statute." *Brinkman v. Bueter*, 879 N.E.2d 549, 553 (Ind. 2008). In *Martin v. Richey*, 711 N.E.2d 1273 (Ind. 1999), the Indiana Supreme Court held that, "under Article 1, §§ 12 and 23 of the Indiana Constitution, the two-year occurrence-based statute of limitations may not constitutionally be applied to preclude the filing of a claim before a plaintiff either knows of the malpractice and resulting injury or discovers facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury." *Booth v. Wiley*, 839 N.E.2d 1168, 1171 (Ind. 2005) (citing *Martin*, 711 N.E.2d at 1284). "In general . . . plaintiff's lay suspicion that there may have been malpractice is not sufficient to trigger the two-year period. At the same time, a plaintiff need not know with certainty that malpractice caused his injury, to trigger the running of the statutory time period." *Id.* (citing *Van Dusen v. Stotts,* 712 N.E.2d 491, 499 (Ind. 1999) (citations omitted)). *See David v. Kleckner*, 9 N.E.3d 147, 152-153 (Ind. 2014) ("[I]n determining whether a medical malpractice claim has been commenced within the medical malpractice statute of limitations, the discovery or trigger date is the point when a claimant either knows of the malpractice and resulting injury, or learns of facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury. Depending on the individual circumstances of each case, a patient's learning of the resulting disease or the onset of resulting symptoms may or may not

constitute the discovery or trigger date. *The issue to be determined is the point at which a particular claimant either knew of the malpractice and resulting injury, or learned of facts that would have led a person of reasonable diligence to have discovered the malpractice and resulting injury*.") (emphasis added).

[13] To the extent Child argues fraudulent concealment, the Indiana Supreme Court has observed:

> The doctrine of fraudulent concealment is an equitable remedy that bars a statute-of-limitations defense when the defendant who invokes it prevented the plaintiff from discovering an otherwise valid claim. Fraudulent concealment may be active or it may be passive. The former category involves affirmative acts of concealment intended to mislead or hinder the plaintiff from obtaining information concerning the malpractice. Passive fraud, on the other hand, involves the failure to disclose material information to the patient.

*Blackford v. Welborn Clinic,* 172 N.E.3d 1219, 1229 (Ind. 2021) (citations and quotation marks omitted). The Court has also stated that when a cause of action accrues is generally a question of law, "[b]ut it can involve questions of fact, including whether fraudulent concealment prevented a party from discovering a cause of action, triggering tolling." *Gittings v. Deal*, 109 N.E.3d 963, 972 (Ind. 2018).

[14] Child filed her proposed complaint with the IDOI on May 26, 2022. With respect to when the statute of limitations began or was triggered, "[t]he issue to be determined is the point at which [Child] either knew of the malpractice . . . or *learned of facts that would have led a person of reasonable diligence to have discovered*

*the malpractice* and resulting injury." *See David*, 9 N.E.3d at 152-153 (emphasis added). At some point prior to the birth of her child in 2019, Child learned that Physician was her mother's fertility doctor and that Physician had allegedly used his own sperm to impregnate some of his patients who believed that donor sperm would be used. Child believed that she resembled her mother's husband and his sister.

[15] We note that, while certainty was not required, Child's mere suspicion that malpractice occurred was not sufficient to trigger the statutory time period. *See Booth*, 839 N.E.2d at 1171. We are obligated to draw all reasonable inferences in favor of Child as the non-moving party. *See Hughley*, 15 N.E.3d at 1003. Whether there is a meaningful difference between Child learning that Physician had used his own sperm to impregnate some of his patients who believed a donor contributed the sperm and learning that Physician also used his own sperm to impregnate some of his patients who believed their husband or partner contributed the sperm is a fact-sensitive determination. Additionally, the impact of Child's belief that she resembled her mother's husband and his sister, and what steps a person of reasonable diligence would take, such as the decision to submit to a DNA test, and when the person would take such steps based upon the information available, are fact-sensitive determinations which cannot be resolved as a matter of law. We find that a genuine issue of material fact exists as to when Child learned of facts that would have led a person of reasonable diligence to have discovered the malpractice. *See Unruh-Haxton v. Regents of Univ. of Cal.*, 162 Cal. App. 4th 343, 356-367 (2008) ("[S]uspicion

based on publicity alone would be insufficient to trigger the statute of limitations. . . . Publicity may arouse suspicion of wrongdoing, but alone it cannot supply the factual basis for a claim because not every patient at the Fertility Clinic was a victim.").

[16]    Accordingly, we reverse the trial court's entry of summary judgment based on the statute of limitations. The issue of whether Child filed her claim within the limitations period is an issue to be resolved by the trier of fact. *See Manley v. Sherer*, 992 N.E.2d 670, 675 (Ind. 2013) (holding genuine issue of material fact existed as to trigger date beginning medical malpractice statute of limitations period and defendants were not entitled to summary judgment on statute of limitations defense); *Herron v. Anigbo*, 897 N.E.2d 444, 452 (Ind. 2008) (when a statute of limitations issue cannot be resolved on summary judgment, "the factual issues relating to the running of the limitations period, such as the date on which the plaintiff first learns of the injury, are to be resolved by the trier of fact at trial"), *reh'g denied*; *Fager v. Hundt*, 610 N.E.2d 246, 253 n.5 (Ind. 1993) ("[W]hen the applicability of the statute of limitations rests upon questions of fact, it is generally an issue for jury determination.") (quoting *Burks v. Rushmore*, 534 N.E.2d 1101, 1104 (Ind. 1989)).[8]

---

[8] Indiana recently adopted Ind. Code Chapter 34-24-5 (eff. July 1, 2019), titled Civil Fertility Fraud, which provides in part that a "woman who gives birth to a child after being treated for infertility by a physician" or a "child born as a result of the actions of a physician" may "bring an action against a health care provider who knowingly or intentionally treated the woman for infertility by using the health care provider's own spermatozoon or ovum, without the patient's informed written consent to treatment using the spermatozoon

For the foregoing reasons, we reverse and remand for further proceedings.

Reversed and remanded.

Altice, C.J., and Tavitas, J., concur.

ATTORNEYS FOR APPELLANT ANONYMOUS CHILD I

W. Kent Winingham
Emily Chimenti
Wilson Kehoe Winingham, LLC
Indianapolis, Indiana


ATTORNEYS FOR APPELLEES ANONYMOUS PHYSICIAN AND ANONYMOUS HEALTHCARE GROUP

Margaret M. Christensen
Zechariah L. Banks
Dentons Bingham Greenebaum LLP
Indianapolis, Indiana

Peter H. Pogue
Michael Francis Mullen
Schultz & Pogue, LLP
Indianapolis, Indiana

---

or ovum," and Ind. Code § 34-11-2-15 (eff. July 1, 2019), which provides in part that "an action for civil fertility fraud (IC 34-24-5) must be commenced not later than: (1) ten (10) years after the eighteenth birthday of the child; or (2) if subdivision (1) does not apply, twenty (20) years after the procedure was performed," Ind. Code § 34-11-2-15(a), and "[a]n action for civil fertility fraud that would otherwise be barred under this section may be commenced not later than five (5) years after the . . . date on which: (1) the person first discovers evidence sufficient to bring an action against the defendant through DNA (deoxyribonucleic acid) analysis . . . ." Ind. Code § 34-11-2-15(b). Child does not present argument regarding Ind. Code Chapter 34-24-5 or Ind. Code § 34-11-2-15, and we make no determination regarding whether the statutes apply to her claims. *See Anonymous Physician 1 v. White*, 153 N.E.3d 272, 283 n.6 (Ind. Ct. App. 2020) (because the plaintiff did not argue his claim was permitted pursuant to Ind. Code Chapter 34-24-5, "we need not determine whether this statute is applicable to [the plaintiff's] claims").

ATTORNEY FOR AMICUS CURIAE INDIANA TRIAL LAWYERS
ASSOCIATION

Jeffrey D. Powless
Powless Law Firm, P.C.
Indianapolis, Indiana